FILED

2016 Aug-29  PM 04:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| STEPHANIE DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 2:15-cv-01111-JHE |
| | ) | |
| INFINITY INSURANCE CO., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

On August 14, 2015, Defendants Infinity Insurance Co. ("Infinity") and Robin Adams moved to dismiss Plaintiff Stephanie Davis's amended complaint or, in the alternative, for a more definite statement under Rule 12(e), alleging, in part, that the amended complaint is a shotgun pleading.  (Doc. 9).  With her response, Davis attempted to file a second amended complaint, (*see* doc. 18), asserting in her response that the amendment mooted the bases for dismissal and for a more definite statement, (doc. 19 at 3).   The second amended complaint was stricken as improperly filed, and Davis moved for leave to amend her complaint, attaching a proposed second amended complaint.   (Docs. 21, 23, & 23-2).   Defendants responded, contending the proposed second amended complaint is futile and still a shotgun pleading that merely exacerbates many of the issues addressed in the previous motion.   (Doc. 25).   Davis's

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 12).

reply denied these assertions.   (Doc. 28).   For the following reasons, Davis's motion to amend, (doc. 23), is **DENIED**.[2]

# I. Standard of Review

The court will "freely grant" a motion to amend "when justice so requires."   FED. R. CIV. P. 15(a)(2).   The court's discretion in deciding whether to grant or deny a motion to amend, however, is not unlimited.   *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1110 (11th Cir. 1996) (citing *Espey v. Wainwright*, 734 F.2d 748 (11th Cir. 1984); *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594 (5th Cir. 1981)).   A district court should allow a plaintiff to amend unless there is a "substantial countervailing reason."   *Id.*   Such "substantial countervailing reasons" include: undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and the futility of the amendment.   *Id.* (citing *Nolin v. Douglas Cnty.*, 903 F.2d 1546, 1550 (11th Cir. 1990)).

"The futility threshold is akin to that for a motion to dismiss; thus, if the amended complaint could not survive Rule 12(b)(6) scrutiny, then the amendment is futile and leave to amend is properly denied." *B.D. Stephenson Trucking LLC v. Riverbrooke Capital Partners, LLC*, No. 06-0343-WS-M, 2006 WL 2772673, at *6 (S.D. Ala. Sept. 26, 2006) (citing *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999)); *see also Fla. Power & Light Co. v. Allis Chalmers Corp.*, 85 F.3d 1514, 1520 (11th Cir. 1996).

---

[2]  Because this Order addresses the shotgun-pleading issues and grants Davis the opportunity to file a second motion to amend her complaint, and the arguments overlap so extensively between Defendants' opposition to the motion to amend and their previous motion to dismiss, Defendants' motion to dismiss or, alternatively, for a more definite statement, (doc. 9), is **DENIED** with leave to file another if Davis either declines to move to amend or is ultimately granted leave to file a new proposed second amended complaint that complies with this Order.

Rule 12(b)(6), FED. R. CIV. P., permits dismissal when a complaint fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted). A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.; accord Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level."). Ultimately, this inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

To that end, under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing the pleader is entitled to relief." "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Iqbal*, 556 U.S. at 678. (citations and internal quotation marks omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 557).

## II. Background[3]

This case arises out of Infinity's implementation of a Spanish/English-bilingualism requirement applicable to employees and potential hires. (Doc. 23-2 at ¶ 24). Davis, an African-American, who was employed as a Policy Services Specialist and does not speak Spanish fluently, was terminated under the policy. (*Id.* at ¶¶ 23-24). Twelve of the seventeen people terminated from the same job were African-American. (*Id.* at ¶ 34). However, Infinity retained five white employees despite them being less senior or less productive or having received formal discipline (which Davis had not). (*Id.* at ¶¶ 30-32).

Infinity also told Davis that, in order to receive benefits under the 2014 Profit-Sharing Plan, she would have to sign a severance agreement giving up her right to file or pursue EEOC charges or Title VII and § 1981 claims, despite already being entitled to the bonus. (*Id.* at ¶¶ 35-36). She was given until December 1, 2014, to sign the agreement. (*Id.* at ¶ 38). She contacted Infinity to inform them denial of the plan benefits violated ERISA, but Infinity's Director of Benefits and Compensation responded the company was standing by its decision to only pay benefits under the plan to those who signed the severance agreement. (*Id.* at ¶ 40). Instead, Davis filed an EEOC charge in October 2014, which was mailed to the Director of Benefits and Compensation on October 31, 2014. (*Id.* at ¶ 38). She was then denied payment of her benefits under the plan. (*Id.* at ¶ 39).

---

[3] "When considering a motion to dismiss [or, as here, its equivalent], all facts set forth in the plaintiff's complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'" *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (quoting *GSW, Inc. v. Long Cnty.*, 999 F.2d 1508, 1510 (11th Cir. 1993)). In other words, these "facts" are taken directly from the proposed second amended complaint.

## III. Analysis

Davis's proposed second amended complaint is an extended morass of extensively repeated legal conclusions interspersed with page-long paragraphs of factual allegations, culminating in a confusingly organized series of counts.  (*See* doc. 23-2).   The result was a series of similarly confused responses with the parties often talking past each other.   (Docs. 25 & 28).[4]   Combining the proposed second amended complaint with those briefs, the Court believes it has determined what Davis's theories are and, to some extent, her claims.   Therefore, to avoid unnecessarily repetitive briefing, the Court will, in the context of its understanding of the claims and theories upon which Davis's proposed second amended complaint stands, address the arguments raised so far in the briefs.

### A.  Standing

As a threshold matter, Davis must establish she has standing to assert the claims she raises in her proposed second amended complaint.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-60 (1992) (discussing standing as "an essential and unchanging part of the case-or-controversy requirement of Article III" upon which the jurisdiction of federal courts is based)[5]; *Tolar v. Cummings*, No. 2:13-CV-00132-JEO, 2014 WL 3974671, at *9-15 (N.D. Ala. Aug. 11, 2014) (addressing the statutory-standing requirement and the "person aggrieved" standard under Title VII).   This is not only a requirement for her personal claims, but also her class claims.   The Eleventh Circuit has held Article III standing to bring a claim and Rule 23 standing to represent a

---

[4] Each of these briefs also incorporates the previous briefs filed in support and opposition to Defendants' motion to dismiss.   (Doc. 25 at 3; doc. 28 at 2 n.1, 6 n.4, 9 n.8, & 9 n.10).

[5] Article III standing requires a showing of "injury in fact," a causal connection between the injury and the conduct complained of, and that the injury will likely be redressed by a favorable decision.  *Lujan*, 504 at 560-61.

class are separate considerations and at least one of the named plaintiffs has to have standing to *individually* raise each of the class claims.   *See Griffin v. Dugger*, 823 F.2d 1476, 1482-84 (11th Cir. 1987).   As a result, if Davis does not have Article III or statutory standing to bring each of the claims she asserts, she does not have standing to raise them on behalf of the class.

On this basis, Defendants contend Plaintiff asserts only that she was terminated and denied compensation under the 2014 Profit Sharing Plan and she does not have standing to raise claims for discrimination in hiring, job assignments, promotions, transfers, re-hiring, recalls from layoff, discipline, evaluations, continued employment and "other conditions of employment."   (Doc. 9 at 7-8).   In response, Plaintiff first briefly asserts she was directly affected by the discriminatory policies in each of these areas, then, for the substantial part of her standing argument, asserts she was also adversely affected by the hiring and termination policy's impact on her "right and ability to work in and enjoy the benefits of a fully integrated workforce that is open and reflective of persons of her race and national origin without such discriminatory policies."   (Doc. 19 at 26-29) (citing, *inter alia*, *EEOC v. Mississippi College*, 626 F.2d 477, 482-483 (5th Cir. 1980); *Thompson v. North American Stainless, LP*, 562 U.S. 170, 176-177 (2011); and *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972)).

### 1.   Direct Adverse Effects

Davis's first example is well taken, stating the discriminatory policies denied her compensation and terms and conditions of work in the form of her profit-sharing plan.   (Doc. 19 at 26).   Defendants have not disputed she alleges a claim for the denial of her benefits under the profit-sharing plan.   What she calls it does not change what the claim is, and Davis clearly has standing to bring a claim for the denial of the profit-sharing plan benefits.

Her second and third examples, however, are entirely conclusory, stating only that she has been "denied hiring, job assignments, rehiring and recall from layoff and transfer opportunities because of such discriminatory policies" and that she has been "denied 'continued employment' because of such discriminatory policies."  (Doc. 19 at 26) (citing doc. 23-2 at ¶¶ 3-5, 23-27, 46-50, 56, & 65-67).  These statements merely restate her legal conclusions (*i.e.*, that she was harmed in these ways) but do not state, or point to, any facts to support the conclusions.  The paragraphs in the proposed second amended complaint, to which Davis cites, make similarly conclusory statements, and none of them state any facts to support harms against Davis, specifically:   paragraphs 3-5 are conclusory introductory statements; paragraphs 23-27 are allegations involving the hiring and termination policy at issue, how it disparately impacts the class, and allegations about the ways in which it affects the class; paragraphs 46-50 are more conclusory statements about the policy's effects; paragraph 56 is a substantively identical conclusory allegation to those coming before it; and paragraphs 65-67 are more allegations about how the policy affects the class with paragraph 66 conclusorily stating "[e]ach of these policies directly and adversely affected Stephanie Davis in the ways set forth in this complaint."

Defendants do not dispute Davis has alleged harm from her termination and the denial of compensation under the 2014 Profit-Sharing Plan.  (*See* doc. 9 at 7) (acknowledging her allegations of two adverse actions, her termination and denial of compensation under the 2014 Profit Sharing Plan).  She does not, however, allege any facts to support she was adversely affected by the alleged discriminatory policy in hiring, rehiring, recall from layoff, promotion, transfer, or job assignments.[6]   In fact, many of her claims appear to be attempts to include every

---

[6] She also alleges it affected her "terms and conditions of employment," (doc. 23-2

potential harm she might have suffered based on the alleged policy—if the necessary underlying facts had ever arisen.  In other words, the argument appears to be that, because she was fired based on this policy, she clearly would have been discriminated against in hiring, rehiring, and recall from layoff and could not have been available for promotion, transfer, or other job assignments.  That, however, is not a proper basis for a claim.  *See Hicks v. Alexander City Bd. of Educ.*, No. 3:11-CV-12-WKW, 2012 WL 3631574, at *5 (M.D. Ala. Aug. 23, 2012) ("A claim for failure to rehire cannot stand apart from a wrongful termination claim unless there is an independent act of discrimination in the refusal to rehire.").  *See also Burnam v. Amoco Container Co.*, 755 F.2d 893, 894 (11th Cir. 1985) ("A simple request for reinstatement "seeks to redress the original termination.") (internal quotation marks omitted); *Poulsen v. Publix Super Markets, Inc.*, No. 1:07V96-SPM/AK, 2009 WL 3080929, at *3 (N.D. Fla. Sept. 23, 2009) ("A 'discharged employee who seeks to be reinstated is really litigating the unfairness of his original discharge because only if the original discharge was discriminatory is he entitled to be reinstated as if he had never ceased working for the employer.'") (quoting *NLRB v. Textile Machine Works*, 214 F.2d 292, 932 (3d Cir. 1954)).[7]   If Davis was not denied hiring, rehiring, recall from layoff, promotion, transfer, or a job assignment, she does not have a concrete, nonspeculative "injury in fact" to allege.

---

at ¶ 48), but that is merely the statutory definition of an unlawful employment practice generally, and does not state a particular factual basis to find the employer discriminated with respect to those terms and conditions of employment.

[7] Although these latter two cases are discussing the issue in the context of the statute of limitations, the rationale (that other claims, without another discriminatory act, are really just relitigating the fairness of the original termination) is still applicable.

### 2.  Indirect Adverse Effects

The more substantial part of her standing argument is that she has "standing to challenge discrimination against other employees . . . so long as she alleges 'a violation of her own personal right to work in an environment unaffected by racial discrimination."  (Doc. 19 at 26) (citing *EEOC v. Mississippi College*, 626 F.2d 477, 482-483 (5th Cir. 1980); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972)).   The problem with this argument, at least to the extent it is intended to support her bringing of claims on behalf of a class, is that Defendants are not disputing her ability to challenge a policy that discriminates against other employees; it is challenging her standing to raise claims for specific harms she did not personally suffer.   The fact her personal right to work in an environment unaffected by racial discrimination was harmed by the allegedly discriminatory policy does not give her standing to raise claims for hiring, rehiring, recall from layoffs, promotion, transfer, or job assignments, in which she does not allege facts to support she was harmed in those ways.

The cases she cites do not state differently.   In *Mississippi College*, the court held a white employee, who was not directly affected by an allegedly discriminatory policy, could raise a claim challenging that policy based on the fact it harmed "her own personal right to work in an environment unaffected by racial discrimination."   626 F.2d at 483.   It explicitly did not hold she could assert the rights of others.   *Id.*   In other words, the court allowed the plaintiff to charge her employer with a violation of Title VII for implementing a discriminatory policy that violated her right to work in an environment unaffected by racial discrimination, not that she could bring a claim for discriminatory recruiting and hiring.   Similarly, in *Trafficante*, the Supreme Court held plaintiffs could raise a claim under Title VIII of the Civil Rights Act of 1968 for harms *the*

*plaintiffs* suffered from a discriminatory policy against prospective tenants (*i.e.*, "(1) [the plaintiffs] had lost the social benefits of living in an integrated community; (2) they had missed business and professional advantages which would have accrued if they had lived with members of minority groups; (3) they had suffered embarrassment and economic damage in social, business, and professional activities from being 'stigmatized' as residents of a 'white ghetto.'").   409 U.S. at 208.   It did not allow the plaintiffs to raise claims for harms they did not suffer.   In *Thompson*, the Supreme Court merely limited the broad wording of its *Trafficante* holding to apply only to those within the zone of interests arguably protected by the statute.   It does not state a plaintiff may raise a claim for harms she did not suffer.

Because Davis does not allege facts to support injury to her in hiring, rehiring, recall from layoffs, promotion, transfer, or job assignments, she does not have standing to assert these claims on behalf of others who might have been so affected by the allegedly discriminatory policy.   Any such claims would be futile.

## B.  Language as Proxy or Pretext for Discrimination

The crux of most of Davis's claims is that the Spanish/English-bilingualism requirement Infinity instituted causes a disparate impact on current and prospective employees who are not of national origins and ethnicities that are traditionally Spanish-speaking and that Infinity intended that impact.   (*See generally* doc. 23-2).[8]   However, Davis confuses the issue by repeatedly referring to the requirement as "facially discriminatory."   (*Id.* at ¶¶ 6, 36, 46, 52, 58, 65, 72, & 74).   A disparate impact claim, by definition, cannot be alleged based on a facially discriminatory employment practice.   *See E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263,

_____

[8] The second amended complaint defines "Hispanic" as a person "of Spanish-speaking national origin and/or Spanish-speaking ancestry, ethnicity or race."   (Doc. 23-2 at ¶ 2).

10

1278 (11th Cir. 2000) ("Simply put, disparate impact theory is available for the challenge of *facially-neutral* employment practices.") (emphasis in original).   This allegation makes it sound as if Davis is trying to assert language as a protected characteristic, which it clearly is not.   *See Milazzo v. Title Cash of Huntsville*, No. 2:11-CV-1858-AKK, 2012 WL 5263584, at *4 (N.D. Ala. Oct. 23, 2012) ("Unfortunately for Milazzo, not being able to speak Spanish is not a protected class.").   The facially neutral language policy is only discriminatory when it has a disparate impact on a protected characteristic or is used as a proxy or pretext for discrimination based on a protected characteristic.

Because of this confusion, Defendants' arguments repeatedly miss the point.   Stating that language itself is not a protected characteristic is uncontroversial.   *See id.* (dismissing the plaintiff's claim for discriminatory discharge because not being able to speak Spanish is not a protected class and she was otherwise unable to show she was replaced by a Hispanic person).   However, the claim Davis is actually asserting is that a facially *neutral* language requirement is being used to have a discriminatory effect on a protected class (*i.e.*, employees of non-Hispanic national origin, ethnicity, and, as defined under § 1981, race[9]).   If properly pled and proven,

---

[9] Regarding Davis's claim under § 1981 (a statute specifically addressing *race* discrimination), the Supreme Court has held:

> Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics.   Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory.

*Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987).   "Among the ethnic groups noted by the [*Saint Francis College*] Court to be distinct races in its review of the legislative history of § 1981 are Latins, Mexicans, and Spanish."   *Cardona v. Am. Exp. Travel Related Servs. Co.*, 720 F.

11

Defendants have pointed to no reason that theory cannot support a viable claim under Title VII. Davis further contends the statistics and other evidence show Defendants intended this facially neutral requirement to cause that disparate impact.   Again, if properly pled and proven, there is no reason that theory cannot support a viable claim under Title VII and § 1981.   The question is not whether "Spanish-speaking" is a protected class (it clearly is not), but whether Davis has alleged sufficient adverse effects on a protected class.   That question is addressed below.

## C. Merits[10]

Based on the proposed second amended complaint, the briefing so far, and the applicable legal principles, the Court has construed Davis's claims as follows:   Count I asserts a Title VII disparate impact claim based on the Spanish/English-bilingualism requirement and the alleged resulting disparity between Hispanics and non-Hispanics; Counts II and III assert (at least after the extraneous adverse effects allegedly occurring to the class are removed) Title VII and § 1981 claims for Disparate Treatment in Terminations based on the disparate impact alleged in Count I; Count IV is a rehash of Counts I through III alleging the adverse effects against the class

---

Supp. 960, 962 (S.D. Fla. 1989) (holding a person of Columbian ancestry had a § 1981 claim where he was discriminated against in favor of employees of Cuban ancestry).   By extension, if Hispanics are a "race" that can be, for purposes of § 1981, protected against preferences for other races, then an African-American of non-Hispanic origin can certainly state claims for protection against preferences for Hispanics.   *See, e.g.*, *Bagwell v. Peachtree Doors & Windows, Inc.*, No. 2:08-CV-191-RWS-SSC, 2011 WL 1497831, at *18 (N.D. Ga. Feb. 8, 2011) ("Plaintiffs have shown that they are members of a protected class, i.e., nonHispanic . . . ."), *report and recommendation adopted*, No. 2:08-CV-0191-RWS, 2011 WL 1497658 (N.D. Ga. Apr. 19, 2011). Because class certification and representation is a separate issue to be dealt with later, the undersigned leaves open any class representation issues under Rule 23.

[10] In Defendants' original motion to dismiss, they argued Plaintiff's gender discrimination claim was not included in her EEOC complaint and the facts in the charge could not be interpreted to encompass one.   (Doc. 9 at 17-18).   In her response, Plaintiff acknowledged she has brought no gender discrimination claim, (doc. 19 at 3), and the proposed second amended complaint does not attempt to raise one, (*see* doc. 23-2).

separately; Count V asserts a Title VII and § 1981 claim for retaliation; and Counts VI and VII assert statutory claims under the Employee Retirement Income Security Act of 1974 ("ERISA").[11]

### 1. Count I – Title VII Disparate Impact Claim

"To establish a *prima facie* case under a theory of disparate impact, [a plaintiff] must show: (1) the existence of a statistically significant disparity among members of different groups affected by employment decisions; (2) the existence of a specific, facially neutral employment practice; and (3) a causal nexus between the specific, facially neutral employment practice and the statistical disparity." *Bryant v. Johnny Kynard Logging, Inc.*, 930 F. Supp. 2d 1272, 1297 (N.D. Ala. 2013); *accord Pouyeh v. Bascom Palmer Eye Inst.*, 613 F. App'x 802, 810 (11th Cir. 2015) (stating a two-element *prima facie* case by subsuming the *Bryant* court's first element into the causation element).   Therefore, to survive a futility challenge, Davis must allege facts to support the conclusion those elements plausibly exist.

She has clearly and specifically alleged the existence of a facially neutral employment practice, (doc. 23-2 at ¶ 24), but Defendants contend Davis has not alleged facts to support the existence of a statistical disparity, (doc. 9 at 12-13 (citing *Pouyeh v. Bascom Palmer Eye Inst.*); doc. 22 at 10-14 (citing *Pouyeh v. Bascom Palmer Eye Inst.* and *Pouyeh v. UAB Dep't of Ophthalmology*, 625 F. App'x 495 (11th Cir. 2015)).[12]   Davis argues the proposed second

---

[11] If Davis disagrees with this construction of her proposed pleading, she has the opportunity under this Order to move to amend with another proposed second amended complaint that more clearly sets out her claims.

[12] Defendants argue a slightly different statement in their opposition to the motion to amend, that Davis's disparate impact claims fail because she "alleges no statistical evidence that any Infinity policies disparately impacted any protected class of Infinity employees."   (Doc. 25 at 5) (citing (citing *Pouyeh v. Bascom Palmer Eye Inst.* and *Pouyeh v. UAB Dep't of Ophthalmology*,

amended complaint must be taken as true when it states the termination and hiring plan disproportionately favored and increased the number of employees with Hispanic national origin, ancestry, and/or race and disfavored those without it.   (Doc. 19 at 5 & 13-14).   Moreover, she argues, the Eleventh Circuit has held statistics are not the only means of proving a disparate impact claim because the court can take judicial notice that a facially neutral policy must in the ordinary course have a disparate impact by its very nature.   (Doc. 19 at 15) (quoting *Craig v. Alabama State University*, 804 F.2d 682, 686-687 & n.7 (11th Cir. 1986)).   Lastly, Davis contends she must be allowed access to discovery of Defendants' records before statistics are required.   (Doc. 19 at 15-17) (citing *Ward's Cove Packing Co. v. Atonio*, 490 U.S. 642, 657-658 (1989)).

### a. Davis's Legal Arguments in Support of Her Disparity Allegations

First, a statement the plan "disproportionately" favors one group over another is not a fact that must be taken as true at the pleadings stage.   Showing a "disproportionate impact" on one protected group as opposed to another is precisely the definition of the legal claim Davis is asserting against Defendants.   *See Pouyeh*, 613 F. App'x at 810 ("First the plaintiff must identify the specific employment practice that allegedly has a *disproportionate impact*. Second, the plaintiff must demonstrate causation by offering statistical evidence sufficient to show that the challenged practice has resulted in prohibited discrimination.") (quoting *Spivey v. Beverly Enters., Inc.*, 196 F.3d 1312, 1314 (11th Cir. 1999) (emphasis added).   Such "[t]hreadbare recitals of the

---

625 F. App'x 495 (11th Cir. 2015)).   However, neither of the cited cases state that statistical evidence must be alleged at the pleading stage, requiring only "factual allegations—usually a statistical disparity—demonstrating disparity in treatment between groups so significant that it supports an inference that discrimination is the cause."   *Pouyeh v. UAB Dep't of Ophthalmology*, 625 F. App'x 495, 497 (11th Cir. 2015).   If sufficient factual allegations are "*usually* a statistical disparity," allegations of statistics are, necessarily, not always required.   The other side of that coin, however, is that, since these claims are usually alleged through a statistical disparity, failure to allege one will likely not be sufficient except under special circumstances.

elements of a cause of action, supported by mere conclusory statements, do not suffice" to count as factual allegations that must be accepted as true.  *Iqbal*, 556 U.S. at 678.  *See also Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) ("In several places the complaint uses the words 'disproportionate' and 'impermissible impact' and other synonyms, but those are bare legal conclusions, not facts.").

Second, the Eleventh Circuit has not held that the court may take judicial notice that a facially neutral policy must in the ordinary course have a disparate impact by its very nature—at least not so broadly as Davis states it.  In fact, Davis edits a particularly important part of the *Craig* opinion out of her quote.  (*See* doc. 19 at 15).  The *Craig* court quoted, with approval, a Fourth Circuit case, which actually stated in full:

> Statistical proof of actual applications is not of course indispensable to proving the disparate impact *prima facie* case, particularly where, as here, the action is individual and not class.  Circumstantial evidence, complemented by judicial notice to show that a facially neutral policy must in the ordinary course have a disparate impact on a protected group of which an individual plaintiff is a member is often utilized.

804 F.2d at 687 n.7 (quoting *Mitchell v. Board of Trustees of Pickens County*, 599 F.2d 582, 585 n. 7 (4th Cir. 1979)).

In *Craig*, the Eleventh Circuit held the plaintiff was not required to prove the disparate impact using direct "statistics of the actual racial composition produced through operation of the criteria" because the plaintiff had shown seventy to ninety percent of the workforce was black in the most relevant categories, which was strong evidence a preference to members of the workforce would perpetuate the racial imbalance sufficient to carry the initial burden of proof.  *Id.* Similarly, in *Walker v. Jefferson County Home*, 726 F.2d 1554 (11th Cir. 1984), which the *Craig* court cited, was also a perpetuation-of-prior-discrimination case, where the prior discriminatory

policy had directly impacted black employees and the challenged neutral policy carried that disparate impact through by requiring the very thing those employees had denied under the previous policy.   *Id.* at 1558.   In both cases, the issue was whether the plaintiff could prove the discriminatory impact of a separate, now defunct policy and use the argument the new policy would perpetuate the old policy's as-yet-unremedied impact as evidence of the disparate impact of the new policy.   This is fundamentally different from what Davis is attempting to do here:   she does not have a prior, proven disparate impact to carry through to the current policy; she wants to avoid that step entirely by having the Court simply assume the policy will create a disparity in the first place.

Even in *Mitchell*, another individual disparate impact case, the Fourth Circuit held that, because of the necessarily limited (statistically insignificant) data points in the record, the district court had been correct to conclude, on a record of three specifically proven applications of the policy to women and the inferences that could be taken from that, a neutral criterion that required self-reporting of a condition only applicable to women "would necessarily impact disproportionately upon women."   599 F.2d at 586.   This is essentially what Davis wants the Court to conclude but (1) as to a class, (2) without having an aspect of the criterion necessarily applying only to her protected class, and (3) without alleging any disparate effects data points at all.

Lastly, *Ward's Cove* does not hold a plaintiff need not allege facts to support a statistical disparity.   Davis asserts she must be allowed access to discovery of Defendants' records "before being put to the test of showing that a particular policy or criterion has disparate impact."   (Doc. 19 at 15-16) (citing *Ward's Cove*, 490 U.S. at 657-58).   However, the cited paragraph of that case

is referring to a requirement to show proof "the disparity [the plaintiffs] complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and nonwhites." *Ward's Cove*, 490 U.S. at 657.   The Court noted the plaintiffs would have the benefit of discovery before being asked to prove separate causation for each individual practice.   *Id.* at 657-58.   None of the cited language allows Davis to avoid alleging facts supporting the existence of a disparity at the pleadings stage.

### b. Davis's Disparity Allegations

Ultimately, Davis does not actually allege the existence of a post-policy disparity. Instead, she alleges speculative assumptions and summaries of old statistics and asks this Court to find they raise an inference of that fact.

Davis alleges the following "facts" to support the existence of a disparate impact:

a. Speaking Spanish is inherent to persons of Hispanic national origin, ancestry, ethnicity and/or race that predominantly speak Spanish, but is not inherent to persons not of such national origins, ancestry, ethnicity, race, such as Stephanie Davis.

b. By definition, preferences and restrictions based on fluency in Spanish automatically favor persons of Hispanic national origin, ancestry, ethnicity and/or race that predominantly speak Spanish.

c. Judicial notice can be taken of the fact that a preference for fluency in Spanish will, as a matter of course, favor persons with a Spanish-speaking national origin, ancestry, ethnicity and/or race and disfavor persons who have a non-Spanish-speaking national origin, ancestry, ethnicity and/or race.

d. The Court can take judicial notice of prior decisions in this and other Circuits which have recognized that language is inherently based on national origin, ancestry, lineage, ethnicity and/or race.   *Sandoval v. Hagan*, 7 F. Supp. 2d 1234, 1282 (M.D. Ala. 1998), *affirmed*, 197 F.3d 484, 507-512 (11th Cir. 1999), *rev'd on*

*other grounds sub nom, Alexander v. Sandoval*, 532 U.S. 275 (2000).[13] Demographic and academic studies have shown the same thing.  *Id.*

e. Spanish-speaking persons in the states and cities in which Infinity operates are predominantly and disproportionately Hispanic in national origin, ancestry, ethnicity and/or race as shown by the demographic data available for these areas.

f. Spanish-speaking persons are predominantly and disproportionately Hispanic in national origin, ancestry, ethnicity and/or race throughout the United States, as shown by the United States census and other demographic data.

g. On information and belief, Infinity's Spanish-speaking applicants' and employees' national origin, ancestry, ethnicity and/or race are predominantly and disproportionately Spanish-speaking or Hispanic.

h. The Equal Employment Opportunity Commission, which is the agency that Congress has charged with the responsibility for determining whether particular policies or criteria discriminate on the basis of race or national origin, has determined that language preferences and restrictions tend to favor or disproportionately disfavor persons based on national origin or ancestry. 29 C.F.R. §1606.1; 29 C.F.R. §1606.7(a). The EEOC determined as part of such regulation that "[t]he primary language of an individual is often an essential national origin characteristic" and "[t]herefore, the Commission will presume that such a [language-based] rule violates Title VII and will closely scrutinize it."  29 C.F.R. §1607.7(a); *see also* 29 C.F.R. § 1606.1 Definition of national origin discrimination ("The Commission defines national origin discrimination broadly as including [decisions made] because of an individual's, or his or her ancestor's, place of origin; or because an individual has the . . . linguistic characteristics of a national origin group.").

(Doc. 19 at 14) (quoting doc. 23-2 at ¶ 25).

The problem with these allegations is that they assume too much.  First, ignoring the semantic quibble that a characteristic cannot be "inherent" in a population in which it only "predominantly" appears, Davis uses statistics from a case addressing only national origin to support her conclusions about national origin, ancestry, ethnicity, *and* race—as if they are all the

---

[13] The district court opinion is hereinafter referred to as "*Sandoval I*," and the Eleventh Circuit opinion as "*Sandoval II*."  The United States Supreme Court reversal of *Sandoval II* was based on the Court's conclusion no private right exists to enforce Title VI disparate impact regulations and is not relevant to the arguments here.

same thing.   Davis does not point to any statistics in *Sandoval*[14] to support the conclusion people merely of Hispanic ancestry, ethnicity, and race speak Spanish in similarly high numbers to those from Spanish-speaking countries.

Moreover, the *Sandoval* courts did not, as Davis asserts, "recognize[] that language is inherently based on national origin, ancestry, lineage, ethnicity and/or race." (Doc. 23-2 at ¶ 25(d)).   In fact, the court explicitly did not hold that.   *See Sandoval I*, 7 F. Supp. 2d at 1280 ("The correct analysis, however, is not whether language equals national origin, but whether the policy of the Department, (here a policy based on language), has an unjustified disparate impact on the basis of national origin.").   What the *Sandoval* courts did hold was something this Court has already acknowledged, that language *can* correlate well enough with national origin to invoke the discrimination statutes.   *See id.* at 1278-83; *Sandoval II*, 197 F.3d at 508 ("Appellants challenge only the district court's conclusions of law.   Specifically, Appellants argue that an English language policy, *even if exerting a disparate impact on the basis of national origin*, cannot ever constitute national origin discrimination.   We conclude otherwise.") (emphasis added).[15]

---

[14] Reliance on the statistics in *Sandoval* also assumes that reliance on statistics from over twenty-five years ago is appropriate for purposes of inferring the existence of a fact.   *See Sandoval v. Hagan*, 7 F. Supp. 2d 1234, 1282 (M.D. Ala. 1998) (relying on statistics from the 1990 census).

[15] Both *Sandoval* courts acknowledged there was otherwise already considerable evidence of a significant disparity.   *See Sandoval I*, 7 F. Supp. 2d at 1291 (stating as introduction to the section titled "Impact of the Department's English–Only Policy" that, "[i]n their pleadings and at trial, Plaintiffs produced substantial evidence showing the impact of the Department's English–Only Policy on non-English speaking applicants for Alabama driver's licenses that are residents of Alabama"); *Sandoval II*, 197 F.3d at 507-08 ("In a detailed order, the trial court marshaled an array of evidence to support its conclusion that the English-only driver's license exam policy, although a facially neutral classification, exerted a disparate impact on the basis of national origin. Appellants, in fact, do not contest any of the district court's findings of fact— . . . as to the disparate impact of the policy on non-English speaking license applicants . . . .").

Davis's reliance on the EEOC regulations is similarly misplaced.  (*See* doc. 23-2 at ¶ 25(h)) (citing 29 C.F.R. § 1606.1 and 29 C.F.R. § 1606.7).   At most, the cited regulations stand for the proposition language requirements *can* constitute national origin discrimination, which this Court has already recognized.   After acknowledging national origin discrimination includes "denial of equal employment opportunity . . . because an individual has the . . . linguistic characteristics of a national origin group," section 1606.1 states "the Commission will apply general title VII principles, such as . . . adverse impact." 29 C.F.R. § 1606.1.   Presumably, that includes the requirement to show a disproportionate adverse impact.

Just as importantly, Davis's conclusion of disparate impact is, in part, premised on the assumption the majority of those who can speak Spanish also speak English and will, therefore, be preferred under the bilingualism policy.   (Doc. 23-2 at ¶ 26) ("For the same reasons [as in the allegations cited above], persons that are bilingual in Spanish and English also have a national origin that is predominantly and disproportionately Spanish-speaking or Hispanic throughout the United States, including the states in which Infinity operates and Infinity's own workforce."). However, none of the allegations referenced support the conclusion a high percentage of Hispanics are also fluent English speakers.   In fact, in *Sandoval*, cited by Davis for its language statistics, (doc. 19 at 9), the court stated the statistical evidence showed "Hispanics comprised the largest number of adults *who did not speak English well or at all*."   7 F. Supp. 2d at 1282.   Based on that, there is no way to know from Davis's allegations what percentage of the ninety-seven percent of Spanish-speaking individuals who are also Hispanic, *id.*, can also speak English and thereby be qualified under the policy.

The only other non-conclusory factual allegations in the proposed second amended complaint regarding the existence of a post-policy disparity are the challenged policy and its implementation; that Davis is a black, non-Hispanic employee who does not speak Spanish but was qualified before implementation of the policy; and that, when Davis was terminated under the policy, twelve of the seventeen people terminated from the same position were black and at least five of the people retained were white and less qualified than Davis.  (Doc. 23-2 at 10, 23-24, 30-32, & 34).   There are no non-conclusory allegations about the protected-class composition of those who were retained or hired.   These facts are insufficient to allege a disparate impact claim under *Iqbal* and *Twombly*.   *See Bascom Palmer Eye Inst.*, 613 F. App'x at 811 ("[T]hat fact is insufficient to show the alleged practice . . . resulted in prohibited discrimination, since it gives no insight into statistical information.").

Although *Craig* and *Walker* might generally support Davis's approach of alleging a disparate effect through circumstantial statistical evidence (instead of direct allegations of the statistical disparity in question), they do not support her attempt to avoid that showing altogether by having the Court simply assume such effects' existence.   In sum, she has alleged the existence of a specific facially neutral policy and established it *could* plausibly lead to a significant disparity adversely affecting protected classes, but she has not alleged facts to support the actual existence of such a disparity adversely affecting her alleged class (non-Hispanics).   Because a showing of disparate effects from the challenged neutral policy (through allegations of statistical evidence or otherwise) is indispensable to a disparate impact claim, Davis's allegations are insufficient to establish a plausible claim for relief.   This claim would be futile.

21

### 2.   Counts II and III – Title VII and § 1981 Disparate Treatment Claims

It is not entirely clear from Davis's proposed second amended complaint whether she is bringing a pattern and practice claim on behalf of the class or if she is attempting to allege an individual disparate treatment claim on her own behalf, or both.   The undersigned will address both potential claims.

### a. Overlap of Disparate Impact and Disparate Treatment

First, the Court must address Davis's argument that a disparate impact claim shows the policy is a pretext for discrimination.   Davis asserts a finding of disparate impact is evidence of a discriminatory motive because, if it has a discriminatory impact without a business necessity, then intentional discrimination must be the reason.   (Doc. 19 at 18-22) (citing *Craig*, 804 F.2d at 686; *In Re: Employment Discrimination Litigation Against The State Of Alabama*, 198 F.3d 1305, 1321 (11th Cir. 1999); and *Ward's Cove*, 490 U.S. at 660-661).   The problem with this argument is a disparate impact claim does not require proof of discrimination and, although the decontextualized language of the cases she cites sounds like it supports her position, none of the cases Davis cites substantively support such a broad conclusion.

First, she cites the Eleventh Circuit in *Craig* for the proposition that, after the employer carries the burden of showing a business necessity, the plaintiff has "the opportunity to demonstrate that the employer was using the practice as a pretext for discrimination or that other criteria were available with a lesser adverse impact on the minority that would still serve the employer's needs."   (Doc. 19 at 18) (quoting *Craig*, 804 F.2d at 686, and string citing for the same proposition *Connecticut v. Teal*, 457 U.S. 440, 447 (1982), *Dothard v. Rawlinson*, 433 U.S. 321, 329 (1977); *Sandoval*, 197 F.3d at 507).   This proposition states that a plaintiff may establish a

22

disparate impact claim by showing the business necessity proffered was pretext (and, therefore, intentionally discriminatory) or by showing other criteria were available with a lesser adverse impact (and, therefore, at least unintentional or subconscious discrimination).   It does not mean that proving disparate impact necessarily shows intentional discrimination.

Next, Davis cites *In Re: Employment Discrimination Litigation Against The State Of Alabama* and *Ward's Cove* for the proposition showing other criteria with a lesser adverse impact is evidence of pretext.   (Doc. 19 at 19-21).   However, in both cases, the courts were addressing showings of lesser adverse impact in the context of the employer's knowledge of that fact.   In the former case, the Eleventh Circuit was discussing whether Congress had gone beyond its powers under the Enforcement Clause of the Fourteenth Amendment (which requires intentional discrimination).   198 F.3d at 1321.   Finding it had not, the court reasoned that, even where the employer had not intentionally discriminated, a plaintiff's showing that there was an equally effective criterion with a lesser adverse impact would prevent *future* intentional discrimination because continued use of the challenged criterion would show the employer was using it as a pretext for discrimination.   *Id.* at 1321-22.   Similarly, the Supreme Court in *Ward's Cove* held that, "[i]f [plaintiffs], having established a prima facie case, come forward with alternatives to [the employers]' hiring practices that reduce the racially disparate impact of practices currently being used, and *[the employers] refuse to adopt these alternatives*, such a refusal would belie a claim by [the employers] that their incumbent practices are being employed for nondiscriminatory reasons." 490 U.S. at 660-61 (emphasis added).   Simply showing there was another better criterion without the employer's prior knowledge and express rejection of it does not alone show pretext.

However, none of that is to say Davis has not established a disparate treatment claim, only that presentation of evidence sufficient to establish a disparate impact theory is not necessarily sufficient to establish a disparate treatment claim.   A mere showing a challenged policy is not a business necessity does not, as Davis asserts, (doc. 19 at 22), establish pretext under this precedent. *See In re Employment Discrimination Litig. Against State of Ala.*, 198 F.3d at 1322 ("All of this is not to say that the plaintiff is ever required to prove discriminatory intent in a disparate impact case; it is clear that what plaintiffs must demonstrate is a discriminatory result, coupled with a finding that the employer has no explanation as to why the challenged practice should be sustained as a job related business necessity.").

### b. Individual Disparate Treatment Claims

Individual disparate treatment claims may be proven with direct evidence or circumstantial evidence.   *Joe's Stone Crab, Inc.*, 220 F.3d at 1286.   Statistical evidence may be used in support of other evidence but cannot alone establish an individual disparate treatment claim.   *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("[S]tatistics alone cannot make a case of individual disparate treatment.") (quoting *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984)).

Although Davis's complaint refers to "direct evidence," she does not, in fact, allege any direct evidence.   (*See, e.g.*, doc. 23-2 at ¶ 59).   Specifically, Davis refers to "direct statements by Infinity that the plaintiff and other non-Hispanic employees were being terminated on the basis of [the allegedly discriminatory] policies," (*id.*), but she does not allege the statements were that non-Hispanic employees were being terminated.   In fact, she alleges they stated—*neutrally with regard to the protected classes*—that they would be "minimizing [their] non-bilingual"

24

employees in order "to allow [them] to increase [their] bilingual staff."   (Doc. 23-2 at ¶ 24).

In order for the evidence as alleged to be evidence of discriminatory intent, it requires the

inferences from other evidence that the facially neutral policies would have a discriminatory

impact and the employers knew it would.   "Direct evidence is evidence that establishes the

existence of discriminatory intent behind the employment decision without any inference or

presumption."   *Joe's Stone Crab, Inc.*, 220 F.3d at 1286.   All of the evidence Davis cites

requires an inference to get from the fact alleged to discriminatory intent.

Nor do the circumstantial allegations raise an inference of discrimination.   Davis clearly

alleges she was a member of a protected class (non-Hispanics), was qualified for her position,

and was subject to an adverse action (her termination).   (Doc. 23-2 at ¶¶ 24 & 29).   However,

she never alleges her replacement was Hispanic.   Although a plaintiff need not allege facts on

every element of the *prima facie* case, the elements are a helpful guide, *see McCurdy v. Auburn*

*Univ.*, No. 3:14CV226-MHT WO, 2015 WL 2064248, at *4 (M.D. Ala. May 4, 2015), and the

crux of the discriminatory treatment *prima facie* case is that someone outside the class was

treated more favorably than the plaintiff.   Even though Davis does not have to specifically name

such a comparator at the motion-to-dismiss stage, *see Melendez v. Town of Bay Harbor Islands*,

No. 14-22383-CIV, 2014 WL 6682535, at *4 (S.D. Fla. Nov. 25, 2014), she does not allege any

facts to establish she was actually replaced by a Hispanic hire or employee.[16]

---

[16] Davis does name a series of specific comparators, who are white and were not terminated despite having discipline records and lower seniority, (doc. 23-2 at 30-32), but those "comparators" are not outside of the only class for which she alleges a claim (current and prospective *non-Hispanic* employees), (*see id.* at ¶¶ 45-97).   It is unclear why these comparators are included in the allegations, especially since they appear to undermine Davis's claim that intentional discrimination against non-Hispanics was the reason for the challenged bilingualism requirement.

The closest she came is stating, in summaries of the evidence supporting her second and third counts, that "Infinity took the jobs that the plaintiff and other non-Hispanic employees were performing without having to speak Spanish and gave those jobs to Hispanic applicants for hire and/or employees."   (Doc. 23-2 at ¶¶ 53 & 59).   However, it is clear from the allegations in her fact section that the language of this statement is merely a conclusion that outstrips the factual allegations upon which it is based.   As discussed above in the context of the disparate impact claim, Davis's allegations are primarily speculation intended to get the Court to assume Hispanics were hired or retained in higher numbers than non-Hispanics.   She has not alleged any non-conclusory facts to support a finding Infinity actually replaced her with a Hispanic employee.   Because Davis has not alleged sufficient facts that taken as true would state a claim for disparate treatment in termination, this claim would be futile.[17]

### c. Class-Wide Pattern or Practice Claims

Although she does not use the term in the second amended complaint, Davis also appears to be attempting to bring a pattern or practice claim on behalf of the class in Counts II and III.

> In such suits, the plaintiffs must establish that . . . discrimination was the company's standard operating procedure.   To meet this burden of proof, a plaintiff must prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts. It has to establish by a preponderance of the evidence that discrimination is the company's standard operating procedure—the regular rather than unusual practice.   While pattern or practice cases are a variant of the disparate treatment theory and thus proof of discriminatory motive is critical, statistical evidence often is used to establish the existence of a pattern or practice.   A plaintiff may establish a pattern or practice claim through a

---

[17] To the extent she intended to raise a disparate treatment discrimination claim for denial of her benefits under the 2014 Profit Sharing Plan, she has not alleged anyone outside of her protected class was allowed to preserve his or her right to file or pursue EEOC charges or discrimination claims and still receive benefits.   Similarly, although she titles Count V "Discrimination/Retaliation," she only alleges facts to support retaliation.   *See* footnote 19 *infra*.

combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally.

*Joe's Stone Crab, Inc.*, 220 F.3d at 1286-87; *accord Griffin v. Carlin*, 755 F.2d 1516, 1525 (11th Cir. 1985) ("In an action alleging class-wide discrimination plaintiffs must establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice.") (quoting *Teamsters v. United States*, 431 U.S. 324, 336 (1977)) (internal quotation marks omitted).    Although Davis removed all reference to the term "pattern or practice" from her proposed second amended complaint and only refers to her claims as "disparate treatment" claims, her response to Defendants' assertion the pattern or practice claims in her amended complaint should be dismissed for lack of class allegations was to include class allegations in the proposed second amended complaint.    (Doc. 19 at 3).    She also appears to continue to allege these claims on behalf of the class.    (*See, e.g.*, doc. 23-2 at ¶¶ 52-56 & 58-62).    Therefore, the undersigned will also address the allegations under the pattern or practice framework.

### i.    Class Requirements of Rule 23

After Davis included class allegations in her proposed second amended complaint, Defendants argued her proposed class claims were still futile because she cannot meet the requirements of Rule 23.    (Doc. 25 at 6).    Plaintiff argues she meets the requirements.    (Doc. 28 at 3).    The class certification question under Rule 23, however, "involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 2552, 180 L. Ed. 2d 374 (2011) (quoting *Falcon*, 457 U.S. at 160), and is generally more appropriate for an opposition to a motion for certification than for a motion to dismiss under Rule 12(b)(6), *see Romano v. Motorola, Inc.*, No.

07-CIV-60517, 2007 WL 4199781, at *2-3 (S.D. Fla. Nov. 26, 2007).   While Defendants could potentially have shown class certification under Rule 23 would be impossible, their current argument is extremely cursory and appears to be addressed to the claims already dismissed for lack of standing.   (*See* doc. 25 at 6-7 & n.9).   As a result, the undersigned defers ruling on the appropriateness of class certification until Davis moves for such certification.

### ii.    Sufficiency of Allegations

While a disparate impact claim does not require proof of discriminatory intent and may be shown by a mere statistical disparity and lack of legitimate excuse for the challenged criteria used, in order to prove a pattern or practice disparate treatment claim with statistics alone, those statistics must be "sufficiently compelling" to raise an inference the discriminatory impact is intentional. *Carlin*, 755 F.2d at 1525.   Usually, it requires "a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally."   *Joe's Stone Crab, Inc.*, 220 F.3d at 1286-87.

Davis states she has alleged a disparate impact from the policy along with evidence the policy was used as a pretext for intentional discrimination.   (Doc. 19 at 13-14 & 22).   The disparate impact allegations have already been addressed above and found lacking.   *See* Section III.C.1.b., *supra*.   As for the proof of intent, while the majority of her allegations are circular, she appears to allege sufficient facts at the pleading stage to find the policy could be pretextual. Her allegations of "direct evidence of discrimination" have already been addressed above and are not "direct evidence."   At most, they are part of her allegations of the policy's implementation and do not alone show discrimination, even if the policy is found to have a disparate impact. *See In re Employment Discrimination Litig. Against State of Ala.*, 198 F.3d at 132.

The allegations she cites for evidence of pretext are as follows:   First, she cites "the policies themselves," (doc. 19 at 22), which are facially neutral and do not show pretext. Second, she cites "direct statements by Infinity that the plaintiff and other non-Hispanic employees were being terminated on the basis of such policies," (*id.*), which is just a rehash of the first argument and the previously addressed "direct evidence" argument.   These statements do not show pretext.   Next, she cites her conclusory allegations of "disparate treatment of similarly situated Hispanic and Caucasian employees and applications for hiring/recall," (*id.* at 22-23), which is just another rehash of her disparate impact argument combined with allegations about white comparators that appear to undermine the argument of intentional discrimination against non-Hispanics as a class.[18]   Then, she cites "statistical and demographic evidence of disparate treatment and disparate impact," (*id.* at 23) (citing doc. 23-2 at ¶¶ 25 & 29), which (1) again is just a rehash of her disparate impact claim, (2) could only show intentional discrimination if "sufficiently compelling," and (3), here, does not even establish disparate impact.

She also points to allegations about Infinity taking jobs from non-Hispanics and "disproportionately" giving them to Hispanics.   (*Id.*) (citing doc. 23-2 at ¶¶ 4, 28-29, & 34). However, none of these allegations indicate intentional discrimination.   Paragraph 4 is just an introductory paragraph, full of legal conclusions.   Paragraph 28 starts as a verbatim retread of paragraph 4, then adds conclusory allegations about jobs being taken from non-Hispanic

---

[18]   Based on these occasional African-American-specific allegations, (*see, e.g.*, doc. 23-2 at ¶¶ 30-34 & 55), it seems Davis intends to bring a disparate treatment claim on behalf of a class of African-Americans, but she repeatedly includes non-African-American non-Hispanics in the disparate treatment claims, (*see, e.g.*, doc. 23-2 at ¶¶ 53, 55, 59, & 61), so it is unclear what exactly her claim is.   The sparse allegations about the race and national origin of those terminated and subsequently hired to replace them do not help clarify the issue.

employees and "disproportionately" given to Hispanics "which had a disparate impact on the plaintiff, African-Americans and persons of non-Hispanic origin, ancestry, ethnicity and/or race generally."   First, this allegation is just a rewording of the ultimate issue (that the result of the policy was disproportionately adverse to non-Hispanics over Hispanics), and, even if it were not, it is, at most, another rehash of the disparate impact claim.   Paragraph 29 does not address this fact at all.   Paragraph 34 is a near verbatim retread of parts of the conclusory allegations of paragraphs 4 and 28 with a concluding sentence attached to the end.   The only new information in paragraph 34 is the statement "[s]eventy percent (12 of 17) of the persons terminated from the Policy Services Specialist job held by the plaintiff were African-American."   (Doc. 23-2 at ¶ 34).   However, this factual allegation only supports half of the disproportionate effect equation (the terminations and not the replacements) and does not alone establish the conclusions she has alleged.

The next four allegations are all in support of her contention Defendants' stated business reason was false, stating she had performed her job well without speaking Spanish and the job had not changed in a way necessitating Spanish.   (Doc. 19 at 23) (citing doc. 23-2 at ¶¶ 23, 28-29, 46-50, & 59).   Because a jury may, under the right circumstances, find pretext based on a showing of the falsity of the proffered reason for an action, this allegation would be sufficient, at least at the pleadings stage, to establish evidence of intent to discriminate—if Davis had established the policy had a discriminatory effect.   *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (holding that, under the *McDonnell Douglas* framework, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's

asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated").

Lastly, she cites her allegation other alternatives were available to satisfy any legitimate business interest Infinity may have had.   (Doc. 19 at 23) (citing doc. 23-2 at ¶ 59).   Not only is this merely a conclusory restatement of the legal standard required to be proved, but even alleging such alternatives would not alone show pretext.   *See In re Employment Discrimination Litig. Against State of Ala.*, 198 F.3d at 1322.

In sum, despite alleging grounds upon which a jury might otherwise be permitted to find discriminatory intent, she has not alleged facts to support a showing of disparate impact; therefore, her pattern or practice disparate treatment claim would be futile.

### 3. Count IV – "Discrimination" in Hiring, Rehiring, Recall, Transfer, Promotion, and Compensation

This count is futile because all of its claims are either brought in the previous three counts or are dismissed for lack of standing.   *See* discussion of standing in Section III.A., *supra*.

### 4. Count V – Title VII and § 1981 Retaliation[19]

Defendants challenge the retaliation claims on the ground the alleged retaliation occurred before the alleged protected activity.   (Doc. 9 at 15-17; doc. 25 at 4).[20]   Specifically,

---

[19] Although she titles Count V "Discrimination/Retaliation," she only alleges facts to support retaliation.   The only allegations not involving retaliation are the conclusory statements the policy "of not paying profit sharing and other benefits to employees who choose to pursue EEOC Charges or a Title VII/§ 1981 lawsuit was both facially discriminatory and had disparate impact on employees like Stephanie Davis who were disproportionately affected by the requirements . . . ."   (Doc. 23-2 at ¶ 72).   There are no allegations in the proposed amended complaint to support the conclusion this policy was only applied to the protected class or that it resulted in a disparate impact over the life of its implementation.   Even Davis's own statement of the policy above implies it was applied to anyone choosing to pursue charges or a lawsuit.   (Doc. 23-2 at ¶ 72).   While that could be retaliatory, there are no allegations it is discriminatory.

Defendants contend Davis alleges she was refused her share of the 2014 Profit Sharing Plan in retaliation for filing an EEOC charge, but, because she did not file a charge with the EEOC until after she was informed she would be terminated and after she was informed those who would be terminated would only be included in the Profit Sharing Plan if they executed a severance agreement, there could be no causation because the decision-makers could not have known of the protected activity before making the decision.   (Doc. 9 at 15-17; doc. 25 at 4).   Plaintiff responds Defendants conditioning benefits on an employee not filing an EEOC charge or a Title VII/§ 1981 claim means she is denied such benefits "because" of the retaliatory policy. (Doc. 19 at 29-30).   Although Defendants have cited authority for the general proposition the retaliatory conduct must follow the protected conduct, (doc. 9 at 15) (citing *Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1282 (11th Cir. 1999)), neither side cites authority directly on point.

However, the Court finds Davis to have the better argument here.   Defendants are correct retaliation cannot occur before the protected conduct; however, telling someone you are going to retaliate against them if they perform protected conduct does not prevent the subsequent retaliation from being "because of" the protected conduct.   The cases Defendants cite for the proposition the retaliatory conduct must follow the protected conduct are premised on the requirement "the employer was actually aware of the protected expression at the time it took adverse employment action."   *GTE Florida, Inc.*, 182 F.3d at 1284.   Similarly, in *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227 (11th Cir. 2006), the court held there was no causation because the decision to terminate the plaintiff (regardless of what she did) was

---

[20]   In their motion to dismiss, Defendant originally challenged the claims based on denial of the benefits under the 2014 Profit Sharing Plan on the basis that, because Davis had not alleged a protected class, the claims were at most state-law claims preempted by ERISA.   (Doc. 9 at 11). They did not reassert this argument in their opposition to the motion to amend.   (*See* doc. 25).

made before the protected conduct.   *Id.* at 1232 (citing *Mack v. Ala. Dep't of Human Res.,* 201

F. Supp. 2d 1196, 1206 (M.D. Ala. 2002)).   *Accord Castillo v. Roche Labs., Inc.*, 467 F. App'x

859, 862 (11th Cir. 2012) (citing *Cotton*).

That is not the case here.   Davis has alleged she was vested in the 2014 Profit Sharing

Plan and, therefore, entitled to the benefits independently of the severance agreement.

(Doc. 23-2 at ¶¶ 35 & 37).   Her benefits were denied only after she refused to sign the

severance agreement and filed an EEOC charge.   (*Id.* at ¶¶ 38-40).   On these facts, the

decision to deny Davis benefits under the plan had certainly not occurred at the time the

severance agreement was offered because payment of the benefits was being premised on

signing the agreement.   Similarly, the adverse action (denying the vested benefits) did not occur

until after the EEOC charge was filed.   Based on the allegations of the complaint, Davis's

retaliation claim does not fail on this ground.[21]

### 5. Counts VI and VII – ERISA Claims

Defendants argue Davis's ERISA breach-of-contract and interference claims are futile

because they are unexhausted, improperly seek equitable relief under § 502(a)(3)(B), and allege

---

[21] Defendants' counterargument fails not because it is incorrect but because it simply
alleges different facts than those in the complaint.   (*See* doc. 25 at 4) (stating "Plaintiff's proposed
Second Amended Complaint does not, and could not, change the simple fact that the purported
retaliatory adverse action -- the decision to condition payment under the company's Profit Sharing
Bonus Plan, *to which she was not otherwise entitled*, on signing a severance agreement -- applied
to everyone affected and, most importantly, **preceded** her protected conduct") (italic emphasis
added).   If Davis had alleged Defendants' only contractual obligation to pay the 2014 Profit Sharing
Plan benefits was through the severance agreement, her retaliation claim would have failed because instead of an adverse action (denial of vested benefits), there would only have been
a contractually bargained-for benefit (payment of benefits) for which she willingly gave up her
claims against her employer.   *See Tolbert v. Follett Higher Educ. Grp., Inc.*,
No. 305CV159-MEF, 2006 WL 559462, at *10 (M.D. Ala. Mar. 7, 2006).   However, on a motion
to dismiss, the Court must accept the factual allegations of the complaint as true.

only conclusorily that the 2014 Profit Sharing Plan is covered under ERISA.   (Doc. 25 at 5-6).

Plaintiff contends she alleged exhaustion to a higher degree than required, (doc. 28 at 11-12);

equitable relief is appropriately sought, (*id.* at 12-13); and a statement the plan is covered by

ERISA is not conclusory but a fact to be taken as true, (*id.* at 13).

First, "[i]t is well-established law in this Circuit that plaintiffs in ERISA cases must

normally exhaust available administrative remedies under their ERISA-governed plans before

they may bring suit in federal court."   *Springer v. Wal-Mart Associates' Grp. Health Plan*, 908

F.2d 897, 899 (11th Cir. 1990).   "Exceptions to the exhaustion requirement do exist, however,

most notably when resort to the administrative route is futile or the remedy inadequate."   *Id.*

(internal quotation marks omitted).   Plaintiff argues she did appeal the decision and that, even if

what she did does not constitute exhaustion, her allegations establish futility.   (Doc. 28 at 11-12)

(citing doc. 23-2 at ¶¶ 24 & 40).   Defendants' cursory argument in its opposition to the motion to

amend does not address whether the steps Davis alleges she took constitute exhaustion under the

Plan or whether the futility exception applies.   (*See* doc. 25 at 5-6).   Because the exhaustion issue

has not been fully briefed, the Court declines to address it here.

Second, in a similarly cursory statement, Defendants contend Davis inappropriately seeks

equitable relief under § 502(a)(3)(B) because legal remedies are available under § 502(a)(1)(B).

(Doc. 25 at 6).   Davis argues not only is she allowed to state alternative claims under Rule 8(d)

but, because she seeks reinstatement under her discrimination claims, she may be entitled to both

damages and prospective equitable relief.   (Doc. 28 at 13).   Defendants' cursory argument has

not addressed the possibility Davis's allegations would result in the statutory remedies "fail[ing] to

remedy all of the wrongs that were done to plaintiff," thereby "trigger[ing] recovery under

34

§ 502(a)(3)." *Short v. Am. Cast Iron Pipe Co.*, 961 F. Supp. 261, 266 (N.D. Ala. 1997). Accordingly, because this issue is also not fully briefed, the Court declines to address it.

Lastly, Defendants contend Davis's allegations the 2014 Profit Sharing Plan is covered by ERISA were conclusory.   (Doc. 25 at 6).   Plaintiff responds with the conclusory statement that her allegations "are not conclusory allegations, but are factual allegations which are taken a [sic] true at the pleadings stage."   (Doc. 28 at 13).   While Plaintiff is wrong about the allegation that a plan falling under ERISA is a factual claim, not a legal one (it requires the legal conclusion that the factual findings about the nature of the plan ultimately constitute a covered plan under the statute), Defendants are also wrong in stating Davis's allegations are merely conclusory.   Although the complaint also includes conclusory allegations of coverage, (doc. 23-2 at 41), Plaintiff alleges more or less what the plan does, (*id.* at 21).   Defendant's cursory argument, however, does not address these allegations; therefore, the Court declines to address the issue here.

As a result, Defendants have failed to establish Davis's ERISA claims in Counts VI and VII are futile on these grounds.

**D.  Claims Against Robin Adams**

Defendants challenge the inclusion of Robin Adams as a proper defendant on the discrimination and retaliation claims "because she cannot, as a matter of law, be held personally liable under Title VII, and [Davis] alleges ***no facts at all*** indicating that Ms. Adams engaged in any discriminatory or retaliatory conduct under § 1981."   (Doc. 25 at 5).[22]   Davis contends Title VII does allow individual liability and she has alleged facts supporting individual § 1981 liability.   (Doc. 28 at 7-8).

---

[22] Defendants do not challenge her status as a defendant under the ERISA claims.   (*See* doc. 25 at 5).

### 1.  § 1981 Allegations

First, contrary to Defendants' conclusory assertion, there are allegations of liability directly against Robin Adams.    The proposed second amended complaint alleges as follows:

> Individual defendant Robin Adams was the Plan Administrator for Infinity's 2014 Profit Sharing Bonus Plan and participated in or was responsible for the policy and decision which denied the plaintiff the profit sharing benefits she had earned for the annual period that ended September 30, 2014. Upon information and belief, Robin Adams (1) was actually aware that the plaintiff had filed EEOC Charges, (2) was actually aware that the plaintiff had not signed the agreement to give up the rights to file such Charges and/or (3) was constructively aware that the plaintiff had not signed such agreement at the time that Adams participated in or was responsible for denying the plaintiff such profit sharing benefits.

(Doc. 23-2 at ¶ 41; *accord id.* at ¶ 77).    The question then is whether these allegations are sufficient to allege a claim.

"To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events."  *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).   Further, "[a] claim for individual liability under Section 1981 requires an affirmative showing linking the individual defendant with the discriminatory action." *Hicks v. City of Alabaster, Ala.*, No. 2:11-CV-4107-RDP, 2013 WL 979070, at *7 (N.D. Ala. Mar. 12, 2013).    Although "knowledge" may be alleged "generally" under Rule 9, the complaint must still contain factual allegations to support the conclusion the defendant had that knowledge. *Cf. Iqbal*, 556 U.S. at 686-87 (holding allegation defendants "discriminated against [the plaintiff] 'on account of [his] religion, race, and/or national origin'" was mere pleading of the elements of the cause of action).

36

Davis's allegation Adams is the Plan Administrator for the 2014 Profit Sharing Plan, (doc. 23-2 at ¶ 41), could raise the reasonable inference Adams was involved in the decision to deny benefits, and the allegations Davis's benefits were denied shortly after Infinity was notified Davis had filed an EEOC charge, (*id.* at ¶¶ 38-39 & 71), could raise the reasonable inference those who made the decision, including Adams, knew about the EEOC charge.   Davis has alleged facts making her ground for relief plausible.   Accordingly, Defendants have not established Davis's § 1981 retaliation claim against Adams is futile.[23]

### 2.  Individual Title VII Liability

Davis's contention regarding individual Title VII liability is simply incorrect under Eleventh Circuit precedent.   Her argument is based on the rationale and holding from a single case, *Wilson v. Gillis Advertising Co.*, No. 92-AR-2126-S, 1993 WL 503117 (N.D. Ala. Jan. 8, 1993).   (Doc. 28 at 7).   The Eleventh Circuit has expressly held since that time that "relief under Title VII is available against only the employer and not against individual employees whose actions would constitute a violation of the Act, regardless of whether the employer is a public company or a private company."   *Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006).   Even the judge who penned the *Wilson* opinion has acknowledged that, under Eleventh Circuit precedent, Title VII "claims against [a defendant] in his individual capacity must be dismissed for failing to state a claim upon which relief can be granted."   *Byars v. UAB Hosp. Mgmt., LLC*, No. 2:14-CV-01338-WMA, 2014 WL 4968213, at *1 (N.D. Ala. Oct. 3, 2014).

Claims under Title VII may only be brought against individuals in their official capacity. *See Hinson v. Clinch Cty., Georgia Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000) ("The only

---

[23] As noted in footnote 19 above, there are no allegations to support a separate claim for discrimination in the denial of benefits under the 2014 Profit Sharing Plan.

proper individual defendants in a Title VII action would be supervisory employees in their capacity as agents of the employer."); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) ("[T]he proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly."); *Byars v. UAB Hosp. Mgmt., LLC*, No. 2:14-CV-01338-WMA, 2014 WL 4968213, at \*1 (N.D. Ala. Oct. 3, 2014).   If the employer is already a defendant, claims against the supervisory employee in her official capacity are redundant.   *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (affirming dismissal of official capacity claims where "functionally equivalent" claims remained pending against the principal).   Because the employer is already a named defendant, any Title VII claims against Robin Adams would be futile.

In sum, because the majority of the claims in Davis's proposed second amended complaint are futile, at least as alleged, her motion to amend is due to be **DENIED**, with leave to move again to amend with a proposed second amended complaint sufficiently alleging viable claims.

### E.  Shotgun Pleadings

Lastly, Defendants contend Davis's proposed second amended complaint is a "shotgun pleading," to which they should not have to respond in answer.   (Doc. 25 at 7-9).   *See also Popham v. Cobb Cty.*, No. 109CV-1477-BBM, 2009 WL 2425954, at \*2 (N.D. Ga. Aug. 5, 2009) ("Shotgun pleadings have been actively condemned in this Circuit.") (citing *Davis v. Coca–Cola Bottling Co. Consol.,* 516 F.3d 955, 979 (11th Cir. 2008)).   A "shotgun pleading" is one which "fail[s] to one degree or another, and in one way or another, to give the defendants

adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015). This may be because it adopts the allegations of all preceding counts into each new count (Type I); it states conclusory, vague, and immaterial facts not relevant to the claims raised (Type II); it does not separate each cause of action or claim for relief into different counts (Type III); or it does not specify which of the multiple defendants are responsible for which acts or claims (Type IV). *Id.* at 1321-23.

Complaints must not only comply with Rule 8's notice pleading requirement, *see* FED. R. CIV. P. 8(a) ("A pleading that states a claim for relief must contain: . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."), but also Rule 10's requirement to include numbered paragraphs, "each limited as far as practicable to a single set of circumstances," FED. R. CIV. P. 10(b); *accord Anderson*, 77 F.3d at 366 ("Where, as here, the plaintiff asserts multiple claims for relief, a more definite statement, if properly drawn, will present each claim for relief in a separate count, as required by Rule 10(b), and with such clarity and precision that the defendant will be able to discern what the plaintiff is claiming and to frame a responsive pleading."). "These rules, working together, require a plaintiff 'to present his claims discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading' and allow the court to determine which facts supported which claims and whether the plaintiff had stated any claims upon which relief can be granted." *Washington v. Bauer*, 149 F. App'x 867, 869-70 (11th Cir. 2005) (quoting *Fikes v. City of Daphne*, 79 F.3d 1079, 1082 (11th Cir. 1996)).

Davis contends her proposed second amended complaint is not a shotgun pleading and "[a] common sense reading of that complaint 'construed so as to do justice' as required by Rule 8(e) demonstrates that the plaintiff has set out her claims and support those claims with more than enough factual material to satisfy Rule 8." (Doc. 28 at 15). As illustrated by the rules and cases set out above, Rule 8 is not about whether a pleading sets out sufficient factual allegations, but *how* they are set out. While the Court believes it has sussed out the claims asserted, Davis's proposed second amended complaint has aspects of the first three of the four types of shotgun pleadings described in the Eleventh Circuit's recent discussion of the "four rough types or categories of shotgun pleadings." *Weiland*, 792 F.3d at 1321-23.[24]

First, the proposed second amended complaint very clearly "contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts . . . contain irrelevant factual allegations and legal conclusions." *Strategic Income Fund, L.L.C.*, 305 F.3d at 1295. Each section containing Counts I through VII incorporates all of the paragraphs before it so that all of the facts and legal conclusions in the introduction through the statement of facts and each of the preceding counts is included in each later count, regardless of whether it supports that count. (Doc. 23-2 at ¶¶ 45, 51, 57, 64, 69, 83, & 93). This is the defining characteristic of the Type I shotgun pleading. *See Weiland*, 792 F.3d at 1321 ("The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive

---

[24] Davis's first amended complaint was also a Type IV shotgun pleading, *see Weiland*, 792 F.3d at 1323 ("Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."); (*see also* doc. 3 at 8-16), but that issue was corrected in the proposed second amended complaint, (*see* doc. 23-2 at 26-44).

count to carry all that came before and the last count to be a combination of the entire complaint.").

The resulting muddle is further exacerbated by the fact several counts do not set out the specific facts supporting them or incorporate the supporting facts by specific reference; instead, they merely state the legal conclusions are supported "[a]s set forth more fully in the foregoing statement of facts and introductory paragraphs," "in the ways set forth in this Complaint," or "in the ways set forth in the Statement of Facts."   (Doc. 23-2 at ¶¶ 46-48, 65-67).   Such statements make it very difficult for Defendants to "discern what [she] is claiming and frame a responsive pleading" and for "the court to determine which facts supported which claims and whether [Davis] had stated any claims upon which relief can be granted."  *Washington v. Bauer*, 149 F. App'x 867, 869-70 (11th Cir. 2005).

There is also a series of paragraphs in the statement of facts, which begins discussing whether Davis and "other non-Hispanic employees" were required to be fluent in Spanish for their jobs and concludes with a discussion of other non-Hispanic (specifically, white) employees who were allegedly less qualified than Davis but were not terminated.   (Doc. 23-2 at ¶¶ 29-32). There is no obvious explanation for how the second part is related to the first part.   Instead, along with a few paragraphs stating that unnamed "selection procedures and criteria" have a disparate impact on African-American employees, (*see, e.g.*, doc. 23-2 at ¶ 34), and the proposed second amended complaint's consistent distinction of African-American employees from the class of "non-Hispanic employees," which allegedly also (for the most part) includes them, (*see, e.g.*, doc. 23-2 at ¶¶ 28 & 34), Davis appears to be trying to set up a race discrimination claim that alleges Defendants discriminated against Davis specifically because she is black.

41

However, as discussed above, no such claim appears to have been raised in the complaint.   This is an aspect of the Type II shotgun pleading.   *See Weiland*, 792 F.3d at 1321-22 ("The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that . . . is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action.").   If such a claim was intended and these are not immaterial facts, Davis has certainly not established "adequate notice of the claims against [Defendants] and the grounds upon which each claim rests."   *Weiland*, 792 F.3d at 1322.

Lastly, the basis for dividing the claims into counts appears to change between counts, causing the counts to overlap and confuse the nature of the claims contained in them.   This is similar to the Type III shotgun pleading "that commits the sin of not separating into a different count each cause of action or claim for relief."   *Weiland*, 792 F.3d at 1322-23.   Specifically, Counts I, II, and III appear to be divided by legal theory, stating claims titled "Title VII Disparate Impact Claim," "Title VII Disparate Treatment Claim," and "§ 1981 Disparate Treatment," respectively.   (Doc. 23-2 at 26, 28, & 31).   They also appear to be based on Davis and the purported class's termination under the previously described discriminatory policies. (Doc. 23-2 at ¶¶ 46, 52, & 58).   However, they also state, after alleging they are based on the termination, that the "policy and practice . . . adversely affects: (a) applicants and potential applicants for hire; (b) continued employment of persons of non-Hispanic and/or African-American persons; and (c) hiring, rehiring, recall, transfer, job assignment and compensation, [of] African-Americans and persons of non-Hispanic national origin, ancestry, ethnicity and/or race."   (Doc. 23-2 at ¶¶ 49; *accord id.* at 56 & 62).   It is not clear why these

42

latter adverse effects are included in the counts supposedly based on discriminatory termination, especially since Count IV restates the causes of action for disparate treatment and disparate impact raised by Counts I through III, but with specific reference to most of the same effects in the count's title (*i.e.*, "hiring, rehiring, recall, transfer, promotion and compensation").   (*Id.* at ¶¶ 64-67).

Count V similarly combines claims for disparate treatment and impact discrimination with Title VII and § 1981 claims of retaliation based on the fact they arise out of the denial of payment under the 2014 Profit Sharing Bonus Plan.   (*Id.* at ¶¶ 69-82).   Despite ostensibly raising discrimination and retaliation claims under Title VII and § 1981, this count also cites the ERISA provision making it unlawful for a person to take certain actions to discourage an ERISA plan participant or beneficiary from exercising his or her rights under ERISA or the plan.   (*Id.* at ¶ 77).   Davis then states a separate count under that provision in Count VII.   (*Id.* at ¶ 95).

Davis's failure to present her claims discretely and succinctly has resulted in pleadings with which the parties have not been able to engage without confusing the issues and talking past each other.   Accordingly, if Davis takes the opportunity to again seek leave to amend, she must correct these shotgun-pleading-like issues and propose a second amended complaint that complies with Rules 8 and 10.

### IV. Conclusion

Accordingly, it is **ORDERED**:

1.  Defendants' motion to dismiss or, in the alternative, for more definite statement, (doc. 9), is **DENIED**, with leave to refile when Davis is granted leave to amend the complaint or the time for her to move for such leave expires;

2. Davis's motion to amend, (doc. 23), is **DENIED**, with leave to move to amend with a proposed second amended complaint complying with this Memorandum Opinion and Order; and

3. Davis has until **September 28, 2016**, to file the motion to amend allowed by this Order.

DONE this 29th day of August 2016.

 

_____

**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE