**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| STEPHANIE DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:15-cv-01111-JHE |
| | ) | |
| INFINITY INSURANCE CO., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION[1]**

Through her Third Amended Complaint, (doc. 51), Plaintiff Stephanie Davis ("Davis" or

"Plaintiff") brings this employment discrimination and Employee Retirement Income Security Act

("ERISA") action against Defendant Infinity Insurance Company (Davis's former employer),

Infinity Property and Casualty Corp. (together with Infinity Insurance Company, "Infinity" or

"Defendants"), and Robin Adams, the administrator of Infinity's ERISA plan ("Adams").  All

three Defendants have moved for summary judgment on Davis's claims.  (Doc. 94).  That motion

is fully briefed and ripe for review.  (Docs. 95, 106 & 111).  Additionally, Davis has moved to

strike some evidentiary material.  (Doc. 104).  Defendants oppose that motion.  (Doc. 110).  For

the reasons stated more fully below, the motion to strike, construed as an evidentiary objection, is

**GRANTED IN PART AND DENIED IN PART**, and the motion for summary judgment is

**GRANTED**.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil
Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge
conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 12.)

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial."  *Id.* at 324.  (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts.  *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam)

2

(citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Evidentiary Objections

Both sides challenge evidence submitted by the other, Davis through a motion to strike, (doc. 104), and Defendants through a request to strike in their reply, (doc. 111 at 16 n.15).

With the December 1, 2010 rules change to Rule 56 of the Federal Rules of Civil Procedure, motions to strike submitted on summary judgment are no longer appropriate. Revised Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The Advisory Committee Notes specify as follows:

> Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

FED. R. CIV. P. 56, Adv. Comm. Notes, "Subdivision (c)" (2010 Amendments). "Before this amendment, parties properly challenged evidence used in a summary judgment motion by filing a motion to strike. The plain meaning of these provisions show that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily." *Campbell v. Shinseki*, 546 F. App'x

3

874, 879 (11th Cir. 2013). Accordingly, the undersigned treats both Davis's motion to strike and Infinity's request as evidentiary objections.

Both objections invoke the "sham affidavit" doctrine. Under that doctrine, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1161 (11th Cir. 2012) (quoting *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir. 1984)). When determining whether to apply the sham affidavit doctrine, "a court must distinguish 'between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence[,]' and an affidavit may be disregarded as a sham only when it creates a clear contradiction. *Tippens v. Celotex, Corp.*, 805 F.2d 949, 953–54 (11th Cir.1986) (quoting *Junkins*, 736 F.2d at 657) (alterations in *Tippens*).

### A. Davis's Motion to Strike

In her motion to strike, Davis challenges the admissibility of portions of the Declaration of James "Jim" Raley ("Raley"), (doc. 96-5 ("Raley Decl.")), a former Infinity Vice President for Customer Service, filed in support of Defendants' motion for summary judgment. (Doc. 104). Discussed further below, Raley's testimony relates to Davis's claim she was terminated on the basis of her national origin by Infinity's alleged effort to hire more bilingual workers.

Davis's objection to Raley's affidavit is that it contradicts his previous, sworn deposition testimony. (Doc. 104 at 1). Specifically, Davis states Raley's deposition testimony admits (1) that Infinity sought to increase the number of employees in its Customer Service Department with

4

bilingual Spanish/English skills, (*id.* at 1-2) (citing doc. 96-14 ("Raley Dep.") at 8 (22:17-23:12), 20 (73:10-73:19), 25-26 (93:23-95:23) & 36 (134:2-135:2)).[2]   Davis states this testimony represents a repeated admission "that the defendant sought applicants with bilingual Spanish/English skills and required those skills for the Customer Service Consultant ("CSC") position and sought applicants with bilingual Spanish/English skills and preferred those skills for the Policy Services Specialist ("PSS") position," which Raley's affidavit arguably contradicts. (*Id.* at 2).  On this basis, Davis requests that the court disregard paragraphs 13, 14, 15, 16, and portions of paragraph 19 of Raley's affidavit. (*Id.* at 2).  In response, Infinity argues Raley's affidavit does not actually contradict, but serves to clarify, his prior deposition testimony, specifically to point out that he was not involved in hiring decisions.  (Doc. 110).

### 1. Paragraph 13

Paragraph 13 of Raley's declaration reads:

> I delegated to Director of I-Care Operations David Richardson the responsibility for implementing Infinity's PSS hiring goals in McAllen and Tucson.  While he consulted with me about the reorganization in general, I was not directly involved in the hiring process.  Specifically, I was not consulted and did not provide input into determining the qualifications or skills Infinity should seek for the PSS position.  Further, I did not interview any PSS applicants or make any PSS hiring recommendations or determinations.  Finally, I was not consulted about any PSS hiring decisions.

(Raley Decl. at 6).  Although Davis highlights portions of Raley's testimony regarding Infinity's advertised hiring practices, (doc. 104 at 5-6), nothing in those excerpts contradicts anything in Paragraph 13 of Raley's declaration regarding his involvement in the hiring process or his input

---

[2] Davis and Defendants each cite their own submission of Raley's deposition.  For clarity, this section of the memorandum opinion cites exclusively to Defendant's version, (doc. 96-14).

into desired qualifications.  Instead, Davis's only objection to this paragraph seems to be that other record evidence concerning Infinity's hiring practices contradicts Raley's claim.  (Doc. 104 at 12-13).  This is not a contradiction between the declaration and the affidavit; it is simply conflicting evidence.  As such, it is not addressed by or subject to the sham affidavit doctrine.  Davis's objection to Paragraph 13 is **OVERRULED**.

### 2. Paragraph 14

In this paragraph, Raley stated:

> The decision to staff PSS teams on-site in the McAllen and Tuscon offices was not made with the goal of increasing bilingual staff in Policy Services.  To the best of my knowledge, Spanish/English bilingual ability played no role in the hiring of PSSs in McAllen and Tucson.  Indeed, PSS Spanish/English bilingual ability was never even mentioned to me, let along discussed as a factor to be considered, in the reorganization process.

(Raley Decl. at 6-7).  Davis contrasts this with the following portion of Raley's deposition:

> Q. But the first bullet point of this Italics in the introduction says, I-Care is undergoing a two-phase reorganization that involves staff reduction to better align our services as Infinity continues to increase focus on the Hispanic market. Do you see that?
>
> A. Yes.
>
> Q. And so the two-phase organization, what does that mean or what do you understand that to mean?
>
> MR. METHENY: Object to the form.
>
> A. Two-phase organization would mean that we're going to have two reorganization situations that are going to follow.
>
> Q. Is that the June and October layoffs?
>
> A. Yes.
>
> Q. And then the next sentence says, As we move in this direction, we are minimizing our customer-facing positions in the Birmingham office. What does the

term customer-facing positions mean to you based on your experience as an employee of Infinity?

A. My definition of customer-facing positions would be individuals that are employed that are working directly with our customers.

Q. Well, the next sentences continues, This means the elimination of some call center and policy operations positions in the Birmingham location. Are the call center and the policy operations the customer-facing positions?

A. Within the customer service department, yes.

Q. And then skip down. It says, and we will be increasing our bilingual staff in Miami and Tucson (McAllen offices at capacity). That was part of your mandate from Glen Godwin?

A. Correct.

Q. And do you understand any of this terminology, the customer-facing positions, the reorganization, or the focus on increasing bilingual staff to be -- all of this applies to both call center and the policy services positions, right?

MR. METHENY: Object to the form.

A. Correct.

(Doc. 104 at 6-7) (citing Raley Dep. at 25-26 (93:23-95:23)).

Unlike Paragraph 13, Paragraph 14 does present conflicting evidence. Rather than meet this head on, Defendants argue there is no tension between Paragraph 14 and a different part of Raley's deposition, in which Raley testified extensively about the CSC position and stated that "[t]he requirement for bilingual skills only applied to call center staff." (Doc. 110 at 4-6) (discussing Raley Dep. at 36 (134:18-135:2)). However, the portion of Raley's testimony cited above shows that, in Raley's understanding, he agreed that the "focus on increasing bilingual staff . . . applies to both call center and the policy services positions . . . ." Regardless of what other portions of Raley's deposition indicate regarding the CSC position, this directly contradicts

Raley's claims regarding the goal of reorganization and that "Spanish/English bilingual ability played no role in the hiring of PSSs in McAllen and Tucson."  Whether there was a requirement or merely a preference for bilingual PSSs, Raley's testimony clearly indicates that bilingual ability played <u>some</u> role in the reorganization process and in the hiring of PSSs.  Therefore, the objection is **SUSTAINED** to this paragraph, and it will not be considered.

### 3. Paragraph 15

Paragraph 15 reads:

> In my deposition, I stated that Infinity would have "preferred" that the PSSs hired have Spanish/English bilingual ability.  I said "preferred" because, all things being equal with two applicants, I would have preferred an applicant with a broader skill set, such as being bilingual.  In my opinion, an applicant with more qualifications (e.g., education, experience, language ability) is, generally, a preferred applicant over someone with less qualifications.  More specifically, a PSS would, on occasion, receive or have communications in Spanish.  If the PSS was Spanish/English bilingual, instead of sending the communications to a Spanish queue to be handled by an in-house translator or by an outside vendor, he or she could handle the communication directly.  In my opinion, this could have removed a processing step, which could improve the customer experience.  Thus, I felt that, all things being equal with two PSS applicants, I would have preferred a bilingual applicant.

(Raley Decl. at 7).

Davis seeks to exclude Raley's interpretation of what he meant by "preferred," as stated in his declaration, in favor of what he now contends he meant.  To support this should be excluded, Davis points to *Bell v. City of Auburn, Alabama*, 722 F. App'x 898, 900 (11th Cir. 2018), which she cites for the proposition that "a party may not redefine terminology used in a deposition through a declaration."  (Doc. 104 at 10-11).  But the cases are not analogous.  In *Bell*, the plaintiff testified at deposition that he did not believe his supervisor was "being racial" by making certain comments.  772 F. App'x at 900.  However, the plaintiff's subsequent declaration stated that "he

understood [the supervisor's] comment to be racially discriminatory . . . ."  *Id.*  The plaintiff attempted to characterize his declaration testimony as defining discrimination, but the plaintiff had explicitly "defined what he meant by discrimination in his deposition testimony."  *Id.*  Here, by contrast, Davis does *not* point to a section of Raley's deposition testimony where he provided his own definition of "preferred" that his declaration now contradicts.  In other words, there is no clear testimony that Raley's declaration opposes.[3]  Instead, Raley has attempted to clarify what he meant by an arguably ambiguous term, which he is permitted to do.  *See Sturdivant v. City of Atlanta*, 2014 WL 11444087, at *8 (N.D. Ga. 2014) (permitting, absent clear contradiction, a deponent to subsequently clarify her view of an ambiguous term); *Spencer v. U.S.*, 2003 WL 23484640, at *9 (D. Kan. 2003) (affidavit not a sham when it explained intended meaning of a term).  Consequently, the sham affidavit doctrine does not bar consideration of Paragraph 15, and Davis's objection to it is **OVERRULED**.

### 4. Paragraph 16

In Paragraph 16, Raley states:

Any time I discussed "preference" or "preferred" in my deposition it was in the context of my opinion and was not an articulation of Infinity's policy or practice or hiring goal. Indeed, I never discussed my opinion with any hiring decision maker and it was never discussed or mentioned to me that a person's Spanish/English bilingual ability was considered, let alone played a role, in any PSS hiring or firing decision. I was also not involved in the hiring decision of any PSS hired in McAllen

---

[3] Davis states "Raley introduced the term 'preferred' and used it to mean the primary skill set sought by the defendant." (Doc. 104 at 14).  She points to no portion of Raley's testimony that supports this definition, and the undersigned has found none in the four instances in which the term was discussed, (*see* Raley Dep. at 59).  The closest Raley comes to defining the term appears to be, after stating that Infinity "preferred someone with a customer service management background," confirming Davis's counsel's statement that "management background would be considered." (Raley Dep. at 9 (27:7-12)).  This is inconsistent with Davis's characterization.

or Tucson and, clearly, I never gave preference to any PSS applicant based on Spanish/English ability (and am not aware of anyone doing so). Also, as I testified in my deposition, Spanish/English bilingual ability was not [a] requirement of the PSS positions being hired in McAllen or Tucson.

(Raley Decl. at 7-8).

Davis does not specifically indicate what is objectionable about this portion of Raley's declaration, but it follows the broad themes of (1) describing Raley's involvement in the hiring process (i.e., the same thing indicated in Paragraph 13) and (2) indicating whether Spanish/English bilingual ability was required. To the extent Davis objects on the same basis she objects to Paragraph 13, her objection is **OVERRULED** because she has not pointed to a contradiction between Raley's deposition testimony regarding his involvement in the hiring process and his declaration. To the extent Davis's objection relates to whether bilingual ability was required, she also points to nothing in Raley's deposition that contradicts that claim. Therefore, her objection is **OVERRULED** on that basis as well.

### 5. Paragraph 19

In full, Paragraph 19 reads:

During my deposition, I was shown Attachment C to this declaration (marked as Exhibit 26 to my deposition) a memorandum titled "Upcoming Staffing Changes." The primary purpose of the memorandum was to inform employees they had been selected for lay-off, the factors considered (e.g., performance, seniority, and relevant skill sets) and the severance package available. The memorandum also simply repeated a previous announcement that Infinity would be "transitioning some positions from the call center and policy services in Birmingham to McAllen, Tucson and/or Miami to increase the number of employees with bilingual Spanish/English skills to better service our customers as the company continues to grow." While the memo references the Call Center and Policy Services, the memo was not intended to imply that these two independent divisions of the Customer Service Department were being reorganized in the exact same manner or for the same reasons. It was easier to have one communication for all affected employees that generally explained the upcoming staff changes. As I stated in my deposition,

<u>the reference to Infinity's goal of increasing employees with bilingual Spanish/English skills made in the memorandum only applied to the Call Center staff.</u>   The memo accurately reflected Infinity's goal of having 100% bilingual Spanish/English Call Center CSCs in McAllen, Texas and Miami in order to better serve its Hispanic clientele.   Accordingly, Spanish/English bilingual ability was a requirement for CSCs hired in McAllen, Tucson and Miami.

(Doc. 96-5 at 9).   Davis objects to the portions underlined above.

The portions Davis objects to are Raley's explanation of the intention of the letter.   Her rationale is that this explanation contradicts the contents of the letter and Raley's testimony that the terminology in the letter "applies to both call center and the policy services positions," (Raley Dep. at 25-26 (93:23-95:23)).   However, Raley's declaration does not directly contradict his testimony on this point, and the declaration's arguable inconsistency with the letter creates at most an evidentiary conflict.   Accordingly, this objection is **OVERRULED**.

### B. Infinity's Evidentiary Objections

In its reply, Infinity challenges a portion of the declaration Davis has submitted in opposition to summary judgment, (Declaration of Stephanie Davis, doc. 103-9 ("Davis Decl."), also under the sham affidavit doctrine.   Specifically, Infinity says Davis's prior testimony concerning incorrect statements and an omission from her job application with Infinity conflict with the reasons she now offers.   (Doc. 111 at 16 n.15).   This evidence relates to Infinity's argument that, even if it is not entitled to summary judgment on Davis's claims in their entirety, Davis's damages are limited due to misrepresentations on her application.   (*See* doc. 95 at 46-47). Since Infinity is entitled to summary judgment on Davis's claims, it is unnecessary to reach this issue.

### III. Summary Judgment Facts[4]

#### A. Infinity

Infinity Insurance Company is a property and casualty insurance company.  (Deposition of Stephanie Davis, doc. 96-1 ("Davis Dep.") at 18 (64:8-65:1)); Declaration of Robin Adams, doc. 96-3 ("Adams Decl.") at ¶ 4).  It is a wholly-owned subsidiary of Infinity Property and Casualty Corporation, which is a holding company with no employees.  (Deposition of Robin Adams, doc. 96-9 ("Adams Dep.") at 8-9 (28:18-29:10), 64 (248:21-249:7)).

At all times relevant to this action, Infinity had within its employee handbook an Equal Employment Opportunity ("EEO") Policy prohibiting unlawful discrimination and retaliation.  (Davis Dep. at 69:1-70:4; Adams Decl. at ¶¶ 5-6; doc. 96-6, Declaration of David Richardson ("Richardson Decl.")[5] at ¶ 4; doc. 96-6 at 24-93).  The EEO Policy was distributed to employees at the time they were hired and was available for review on Infinity's network at all times.  (Davis Dep. at 19-20 (69:1-70:4); Adams Decl. at ¶¶ 5-6; Richardson Decl. at ¶ 4; doc. 96-6 at 24-93).

In 2014, Infinity's Customer Service Department consisted of two units: the Call Center and Policy Services.  (Deposition of Deanna Edgecomb, doc. 96-10 ("Edgecomb Dep.") at 7 (18:10-20:5), 9 (26:5-31:14)).  The units were independent, with different managers, supervisors, physical locations, job positions, and purposes.  (Deposition of David Richardson, doc. 96-15

---

[4] These facts are undisputed or, if disputed, taken in the light most favorable to Davis.  Because Davis has abandoned her ERISA claim, as discussed below, this section omits any facts relevant to that claim.

[5] Richardson's declaration and its attachments consist of docs. 96-6, 96-7, and 96-8.  When referring to Richard's declaration, this memorandum opinion cites it by name.  The memorandum opinion cites each exhibit to the deposition by where it appears on the docket.

("Richardson Dep.") at 7-11 (19:8-23, 20:1-24:16, 28:22-31:6, 33:18-35:2), 29 (107:7-17)). During the time relevant to this action, the Call Center was managed by Assistant Vice President of Customer Service Deanna Edgecomb ("Edgecomb"), while Director of I-Care Operations David Richardson ("Richardson") managed Policy Services. (Edgecomb Dep. at 5 (11:23-12:1), 7-9 (21:1-5, 25:12-26:11, 28:20-29:23); Raley Dep. at 12 (39:19-40:3), 25 (92:10-16); Richardson Dep. at 9-11 (28:22-30:1, 30:9-31:6, 33:14-34:5); Richardson Decl. at ¶ 7).

The Call Center handled "customer-facing" functions related to phone calls; for example, taking payments and answering customer questions. (Edgecomb Dep. at 7-8 (19:16-22:19, 25:12-17); Richardson Dep. at 11 (35:3-15), 32-33 (121:11-122:2)). The Call Center employed CSCs, whose jobs required being on the phone with customers at all times. (Richardson Dep. at 7 (20:5-17), 11 (35:3-36:3); Edgecomb Dep. at 7-8 (19:11-21, 23:17, 25:12-17); Raley Dep. at 10 (32:12-20)).

Policy Services handled "back-office" functions related to reviewing and processing policy information. (Richardson Dep. at 8-11 (23:15-26:15, 30:2-20, 33:18-34:11, 36:4-18); Raley Dep. at 11 (34:14-36:16); Richardson Decl. at ¶ 9). Policy Services employed PSSs, whose job responsibilities included "processing new business uploads, and applications, renewal offers, outstanding requests to agents or insureds known as suspense items, endorsements that come through fax, e-mail, things along those lines, responding to customer inquiries that come through fax or e-mail, outbound phone calls to a customer or agent if there's a question that comes out of one of those documents . . . . SR22s, state reporting." (Richardson Dep. at 11 (36:4-18)). Infinity coded some of these responsibilities as "UARS" (for "Upload Auto Release"), "SUSPENSE" (for a policy with outstanding items), and "RENEWAL" (for a customer who needed to be contacted

regarding renewal).  (Richardson Decl. at ¶ 10).  PSSs spent less than five percent of their time on the phone.  (Richardson Dep. at 31 (116:6-17)).  PSSs were not required to speak Spanish, and if a PSS was not bilingual, any task that required Spanish-speaking ability would be sent to a Spanish queue to be handled by a translator).  (Davis Dep. at 22-23 (78:7-79:2, 80:3-82:6, 83:20-85:7); doc. 96-1 at 90-140; doc. 96-2 at 1-23; Deposition of Amel Garcia, doc. 96-12 ("Garcia Dep.") at 16 (54:14-25); Richardson Dep. at 33 (122:3-18), 35 (132:3-12), 46 (174:1-175:2); Raley Dep. at 15 (50:1-11); Richardson Decl. at ¶¶ 9, 13; doc. 96-6 at 95-97; Declaration of Amel Garcia, doc. 96-4 at ¶ 10).  Between one and three percent of documents PSSs worked with were submitted in Spanish.  (Richardson Dep. at 33 (124:16-23), 35 (132:3-12)).

Many of the PSSs in the Birmingham location were able to work from home.  (Raley Dep. at 21 (74:5-5-10)).

### B. Davis's Employment at Infinity

Infinity hired Davis as a Cash Clerk on April 15, 2020.  (Davis Dep. at 18-19 (65:2-67:7)).  Based on Davis's performance, Infinity promoted her to Policy Services Specialist I ("PSS-I") in February 2006 and to Policy Services Specialist II ("PSS-II") on March 4, 2012.[6]  (Doc. 103-13; Davis Dep. at 21-22 (77:9-79:23); Adams Dep. at 25 (91:20-93:10); Richardson Dep. at 21 (75:20); Raley Dep. at 11-12 (37:21-38:15), 34 (127:7-10)).  Davis never worked at an Infinity call center or in any location outside Alabama.  (Davis Dep. at 18-19 (65:2-67:7), 21-22 (77:9-79:23)).

Davis earned "Met" or "Exceeded" marks on performance evaluations throughout her

---

[6] PSS II is an in-grade promotion available after a PSS I has met certain ratings for consecutive quarters.  (Richardson Decl. at ¶ 12).

employment at Infinity.  (Doc. 103-12; doc. 103-14; doc. 103-15; Adams Dep. at 23-24 (85:4-88:16), 26-28 (94:20-97:9, 98:21-102:14); Richardson Dep. at 20-22 (73:4-75:6, 77:4-78:19, 79:21-81:3); Deposition of John Finney, doc. 96-11 ("Finney Dep.") at 9-11 (29:1-31:15, 32:5-35:3. 35:9-36:4)).  Davis's 2011 annual performance evaluation includes as an overall comment in the space reserved for manager comments: "I can always count on Stephanie in any situation." (Doc. 103-12 at 2).  In the same location on her 2013 evaluation, her manager stated: "Stephanie can handle multiple tasks with ease. She handles all assignments in a highly professional and competent manner. Stephanie is willing to do whatever it takes to get the job done and even perform tasks or jobs that are not her own. She has become a go-to person for our team."  (Doc. 103-14 at 2).  And in Davis's 2014 evaluation, her manager commented: "Stephanie possesses many talents and capabilities, produces solid quality and quantity of work daily and weekly." (Doc. 103-15 at 3).  However, Davis's 2014 review stated she needed "to work on dealing with changes as the department moves forward.  Do more diverse work in Iqueue, more UARS, SUSPENSE, RENEWAL BUILD.  Increase the amount of PFO done weekly to no less than 150." (*Id.*).

### C. Customer Service Department Reorganization

Infinity's company mission is to be "the low cost insurance provider of choice for Latino and urban markets."  (Doc. 96-2 at 51-52; Richardson Dep. at 13 (42:3-13), 28-29 (105:21-106:15); Raley Dep. at 18-19 (65:4-22, 69:2-6); Richardson Decl. at ¶ 14; Raley Decl. at ¶ 6).  To focus on these groups, Infinity developed a corporate strategy to consolidate its business operations and physical locations in four states with large Hispanic populations—California, Florida, Texas, and Arizona—and exit business segments not aligned with its focus markets.  (Davis Dep. at Def.

Exh. 20; Richardson Dep. at 47 (180:2-14), 51-52 (197:14-198:9); Richardson Decl. at ¶ 14; Raley Decl. at ¶ 6).  Raley was responsible for implementing this initiative.  (Raley Dep. at 18 (64:20-65:22)).

In particular, owing to an increase in Spanish or bilingual call volume in the Call Center, Infinity focused its efforts on the customer contact centers in McAllen, Texas, and Tucson, Arizona, aiming to achieve 100% bilingual CSC capability in those locations.[7]  (Richardson Dep. at 32-33 (121:2-124:7); Richardson Decl. at ¶¶ 17, 19; Raley Decl. at ¶ 9).  As part of the reorganization, Infinity decided to hire only local Spanish/English bilingual CSCs at the McAllen and Tucson centers, as well as in Miami, Florida (where CSCs worked remotely); in its view, this would help it handle increased Spanish-language call volume, improve customers' experiences, and lower costs.  (Richardson Dep. at 32-33 (121:2-124:7); Edgecomb Dep. at 15 (50:5-19); Richardson Decl. at ¶¶ 19, 50; Raley Decl. at ¶ 9).  Infinity also decided to staff one PSS team onsite at each of these locations to support the local call centers, deal with local management, and eliminate issues arising from all PSSs being based in Alabama.  (Richardson Dep. at 15 (50:22-52:15), 47 (179:16-180:14); Richardson Decl. at ¶¶ 20, 21; Raley Decl. at ¶ 10).  In addition, Infinity determined that this staffing arrangement would provide cost savings and reduce overhead. (Richardson Dep. at 51-52 (197:14-198:9); Richardson Decl. at ¶ 23; Raley Dep. at 19 (66:7-67:3); Raley Decl. at ¶ 10).  Raley testified that Infinity sought "to make our operations more efficient

---

[7] Infinity had operated the McAllen office from 2008 to 2014 with no on-site PSSs, relying on PSSs in Birmingham for support.  (Edgecomb Dep. at 9-10 (28:8-31:14); Raley Dep. at 7-9 (20:16-24:11, 27:13-20)).  The Tucson office opened in June 2013 with no on-site PSSs, also relying on Birmingham PSSs.  (*Id.*).

and to be able to take advantage of less expensive rent and labor in other locations, and researched "to determine from an economic standpoint where we thought we could operate most efficiently, that we could hire employees, and was going to have a good labor market at salaries that would be less than Birmingham."  (Raley Dep. at 19 (66:18-67:9)).

Infinity did not require PSSs at the Tucson and McAllen locations to be Spanish/English bilingual.  (Garcia Dep. at 9 (27:10-16); Richardson Decl. at ¶¶ 24, 49-50; Raley Dep. at 8-10 (24:1-6, 29:2-7, 31:1-5); Garcia Decl. at ¶¶ 10-11, 20; Raley Decl. at ¶¶ 8, 16).[8]  Although the goal of the transition was not to have 100% Spanish-English bilingual PSS staff, Infinity's expectation was that they would see an increase in bilingual PSSs.  (Richardson Dep. at 29 (109:6-18)).

Amel Garcia ("Garcia," who is Hispanic), whom Infinity hired in July 2014 as a PSS Supervisor, made the PSS hiring decisions in McAllen and Tucson.  (Garcia Dep. at 7-9 (19:4-16,

---

[8] Davis states "Infinity hired new employees into PSS positions using the applicant pool for positions which were advertised as requiring bilingual Spanish/English skills."  (Doc. 106 at 13-14).  To support this, she points to two main pieces of evidence, as well as testimony discussing these pieces of evidence.  The first is a web article from Tucson News Now advertising a "Bilingual hiring fair for insurance call center."  (Doc. 103-58).  The article was posted on May 7, 2014 and updated on May 21, 2014.  (*Id.*).  It indicates that "[t]he job fair will be from 8 a.m. to 8 p.m. this evening at the Infinity Insurance Office."  (*Id.*).  It also indicates that Infinity is "opening the doors to their call center, and are looking to recruit 150 bilingual customer service representatives."  (*Id.*).  The second is an email dated August 7, 2014, sent by customer service manager Ana Ramos to Richardson.  (Doc. 103-17; Richardson Dep. at 31 (115:5-8)).  In it, Ramos asks: "In preparation of the job fair, the team here wanted to find out if there is something specifically you are looking for PSS's that may be different for CSC's given that it is a different position . . . . These are questions we get [sic] we interview and want to make sure we give potential candidates accurate information."  (Doc. 103-17 at 2).  Davis does not indicate why it is reasonable to infer that the job fair Ramos was preparing for in an email that postdates the advertised job fair by several months would have been promoted in the same way, particularly since the advertised job fair specifically contemplates hiring "customer service representatives" for the call center (i.e., the position it is undisputed Infinity required to be Spanish-English bilingual).

22:8-14, 23:3-8, 24:10-26:21, 29:12-15, 27:2-28:5, 29:12-23), 15 (51:2-11); Garcia Decl. at ¶¶ 9-11; Richardson Dep. at 26 (96:22-97:1), 45 (170:16-23); Richardson Decl. at ¶ 47).  Garcia testified he considered the applicants' job history, resume and quality of interview, and bilingual ability was not a factor in any PSS hiring decision.  (Garcia Dep. at 10 (31:6-32:3), 12 (39:11-18), 23-24 (85:16-89:18); Garcia Decl. at ¶¶ 9-11).  Garcia testified bilingual ability was not preferred.  (Garcia Dep. at 9 (27:10-16)).  Garcia did not inquire or otherwise attempt to determine whether a PSS applicant was bilingual and told applicants "no" when asked if bilingualism was a requirement for the PSS position.[9]  (Garcia Dep. at 10 (30:25-31:7); Garcia Decl. at ¶¶ 12-14).  Garcia did not participate in terminating employees in other locations.  (Garcia Decl. at ¶ 19).

In contrast to some of Garcia's testimony, Raley testified that bilingual ability *was* preferred in a PSS applicant.  (Raley Dep. at 10 (31:1-6), 20 (73:15-19)).  By this, Raley later stated in his declaration that he meant he would prefer a bilingual applicant over a non-bilingual applicant, all things being otherwise equal.  (Raley Decl. at ¶ 15).  Raley stated this was his personal opinion only rather than Infinity's hiring policy, and that he was not involved in hiring decisions and had never discussed his preferences with decisionmakers.  (*Id.* at ¶¶ 13, 16).  However, Infinity's records reflect that Raley interviewed PSS candidate Steven Martinez (Hispanic) and made the recommendation: "Proceed with Policy Services.  Not fully bilingual.  Advised that promotional opportunities would be limited."  (Doc. 103-110 at 15; doc. 96-8 at 7).

---

[9] Davis includes as a fact that "Infinity routinely determined applicant's [sic] fluency in Spanish and English during interviews."  (Doc. 106 at 15).  However, the citation for this is Edgecomb's deposition, in which she specifically discusses interviews for CSCs.  (Edgecomb Dep. at 24-25 (88:3-90:12)).

Raley also interviewed Melba Corona (Hispanic, bilingual) for a "Policy Services or Call Center" position in Tucson, (doc. 103-105 at 30-36), and Lasette Smith (Hispanic, bilingual) for a PSS position in Tucson, (doc. 103-107 at 15).  All three of these candidates were hired.  (Doc. 96-8 at 6-7).

Regardless, the job description used to hire PSSs in McAllen and Tucson did not include bilingual ability as a requirement.  (Doc. 96-6 at 95-97).  Nevertheless, many of the PSSs hired or promoted in the August/September 2014 time frame had bilingual Spanish/English skills; nine of eleven PSSs hired or promoted in McAllen, and eight of ten PSSs hired in Tucson.[10]  (Doc. 103-89; doc. At least eight PSSs hired or promoted in McAllen and Tucson between July 2014 and October 2016 were not bilingual: Ihab Atouf (white), Susan Castillo (Hispanic), Manuella Comeaux (white), Steven Hernandez (Hispanic), and Doree Thornton (white) in Tucson and Kathleen Deleon (Hispanic),[11] Deborah Maldonado (white),[12] and Douglas Marrel (white)[13] in McAllen.  (Garcia Decl. at ¶¶ 12-13; Richardson Decl. at ¶¶ 49, 55; doc. 96-7 at 6-7).

---

[10] Davis counts Steven Martinez (Hispanic) as a bilingual employee, (doc. 106 at 15), while Defendants count him as a non-bilingual employee.  As noted above, Martinez was not fully bilingual. (Doc. 103-110 at 15).  Since the parties have not defined what it means to be "bilingual," and since neither party relies on Martinez for anything more than his Spanish-speaking ability, Martinez counts as a bilingual for summary judgment purposes.

[11] Deleon was initially hired by Infinity on January 20, 2014, but was promoted to PSS I on September 28, 2014.  (Doc. 103-114 at 47).

[12] Like Deleon, Maldonado was initially hired prior to the reorganization, but was promoted to PSS I on September 28, 2014.  (Doc. 103-113 at 53).

[13] Marrel's name does not appear on the list of employees produced by Infinity in discovery, but Richardson's declaration indicates Infinity supplemented this list with Marrel's name and personnel file.  (Richardson Decl. at ¶ 52).  Richardson states Marrel is "a White employee, which I know based on my personal knowledge, who moved into the PSS position on July 17, 2016" in McAllen.  (*Id.*).

### D. 2014 Reduction in Force

In June 2014, as part of the reorganization, Infinity began a two-phase reduction in force ("RIF") that impacted some Call Center and Policy Services employees in Birmingham.  (Davis Dep. at 24 (86:7-87:7)); Edgecomb Dep. at 14-15 (46:4-7, 49:2-50:19), 18 (62:1-64:16), 20 (71:15-72:3); Richardson Dep. at 30 (110:2-113:9), 44 (166:6-11); Raley Dep. at 26 (94:1-95:15, 96:1-97:16); Richardson Decl. at ¶¶ 26-27).  It announced this policy to Birmingham staff on June 2, 2014.  (Davis Dep. at 26 (94:21-95:22), 30 (130:18-131:23), 44 (134:10-21); Doc. 103-18).  Memorialized in an email from Edgecomb to Raley, Edgecomb's conversation outline for that meeting stated:

> I have some important news to share with you. To ensure the information is shared effectively for everyone on the call, all will have an opportunity to express concerns or comments before I close the session towards the end.
>
> * Icare is undergoing a 2 phase reorganization that involves staff reduction to better align our service as Infinity continues to increase focus on the Hispanic market
>
> * As we move in this direction, we are minimizing our customer facing positions in the Birmingham office
>
> -This means:
>
>> -The elimination of some call center and policy operations positions in the Birmingham location
>>
>> -Most Birmingham positions will be home based -And we will be increasing our Bilingual staff in Miami and Tucson. (McAllen office is at capacity)
>
> *I mentioned this is a 2 phase process of staff reduction.
>
>> -phase 1 staffing changed [sic] will be completed on 6/27/14
>
> *We reviewed:
>
>> -Performance, Disciplinary Actions and Hire Dates to make our go forward staffing decisions

*Meetings / conference sessions will be held with all those impacted by this 1st phase as quickly as possible

*Phase 2 is planned for late 3q or early 4Q based on workloads and volumes

*All affected employees will be offered severance of

       -1 week pay for every full year of service plus 1 week for partial year

       -based on latest hire date and scheduled hour

(Doc. 103-18).

Only PSSs in Infinity's Birmingham office were considered for the 2014 RIF; Infinity had no Policy Services employees at all in McAllen or Tucson prior to Phase I of the RIF. (Richardson Decl. at ¶ 27). Richardson and the Policy Services management team were responsible for the staff reduction for Policy Services, while Edgecomb and the Call Center management team were responsible for the RIF as it pertained the Call Center. (Davis Dep. at 25-26 (91:6-93:7, 94:15-96:6); Edgecomb Dep. at 19-20 (68:22-69:5, 69:16-70:13), 25-26 (93:12-94:15); Richardson Dep. at 32 (118:14-119:9), 37 (141:4-14), 44 (166:12-167:2); Richardson Decl. at ¶ 28). Call Center employees were selected for the RIF based on discipline, call handling performance, and years of service ("YOS"). (Edgecomb Dep. at 25-26 (93:12-20, 94:16-97:14)). PSSs were selected for the RIF as set out below. No distinction was made between PSS I and PSS II in the RIF. (Richardson Decl. at ¶ 38). Spanish/English bilingual ability was not considered and played no role in which employees were selected for the RIF. (Davis Dep. at 25-27 (91:6-94:20, 100:6-10), 32 (118:12-20), 36-37 (134:16-135:3, 138:19-22); Richardson Dep. at 141:4-14; Richardson Decl. at ¶ 37). No PSS considered for the 2014 RIF was Hispanic. (Expert Report of Carole M. Amidon ("Amidon Report I") at 3-7; Supplemental Expert Report of Carole M. Amidon ("Amidon Report

II") at 3-6).[14]

Phase I of the RIF was completed on June 27, 2014.  (Richardson Decl. at ¶ 26).  This portion of the RIF took into account disciplinary history, and four PSSs were eliminated based on having a written warning or more serious discipline in the preceding twelve months.[15]  (Richardson Decl. at ¶ 29; Davis Dep. at 26-27 (94:15-98:19)).  Disciplinary actions below a written warning and/or older than the preceding twelve months were not considered as a factor in the layoff criteria.  (Richardson Decl. at ¶¶ 44, 45).

Phase II of the RIF was completed on October 31, 2014.  (Richardson Decl. at ¶ 26).  It used a more complicated metric to select Policy Services employees for elimination.  Specifically, employees were ranked based on three components: Year to Date ("YTD") Raw Score, YOS Score, and Impact Factor.  (Richardson Dep. at 37 (140:12-141:14); Richardson Decl. at ¶ 30).  YTD Raw Score took into account an employee's performance from January 2014 through July 2014, measuring productivity and quality for that period.[16]  (Richardson Decl. at ¶ 31).  YOS Score consisted of a PSS's total years of service divided by 10.  (*Id.* at ¶ 33).  Impact Factor measured input from the four PSS supervisors, who assigned each PSS a score between 0 and 4.  (*Id.* at ¶ 34).

---

[14] Dr. Amidon's report and its supplement are both contained in doc. 96-17, with the report comprising pages 1-16 and the supplement comprising pages 17-35.  The citations to the reports refer to their internal page numbers, not where they appear on the docket.

[15] An additional PSS, Tracy Price, voluntarily resigned prior to the October 2014 layoff.  (Richardson Decl. at ¶ 35).

[16] At the time of the RIF, Infinity had recently eliminated a hybrid Policy Services Consultant ("PSC") position and integrated some PSCs into PSS roles.  (Richardson Decl. at ¶ 31).  PSCs spend approximately half the time handling calls and half the time performing processing functions.  (*Id.*).  Since PSC annual evaluations measured different criteria than PSS annual evaluations, Infinity determined that the best apples-to-apples performance metric would be the 2014 YTD Score: a processing-only productivity and quality assessment.  (*Id.*).

Richardson testified Impact Factor "was a number generated for us to assess the ability of people to handle change, the complexities that were in common as we looked to adapt across the organization and grow operations at other sites, and the people that we were going to need at the table to help us do that, change being the largest component." (Richardson Dep. at 39 (149:7-13)).

### E. Davis's Termination

On September 17, 2014, Davis received a written memo informing her she had been selected to be laid off on October 31, 2014. (Davis Dep. at 24-25 (87:2-90:19); doc. 96-2 at 25). This memo, which had been written and approved by Raley, largely mirrored Edgecomb's talking points from the June 2, 2014 meeting. (Raley Dep. at 4 (9:10-19), 35-36 (133:5-134:22); doc. 103-18; doc. 103-19). In relevant part, the memo stated:

> As previously announced we will be transitioning some positions from the call center and policy services in Birmingham to McAllen, Tucson and/or Miami to increase the number of employees with bilingual Spanish/English skills to better service our customers as the company continues to grow.
>
> The decisions to lay -off employees were extremely difficult due to the high quality of work and dedication of the employees in Infinity's workforce. We regret to inform you that you have been selected as one of the people who will be laid off on October 31, 2014. Criteria for lay-off was based on a combination of factors, including performance, seniority, disciplines and relevant skill sets. We sincerely thank you for your service to Infinity and hope to make this transition as easy as possible.
>
> [ . . . ]
>
> We encourage you to watch for positions posted on the Employee Career site which may be accessed through Employee Self Service and to apply for positions for which you qualify.

(Doc. 103-19). The memorandum made no distinction between call center and policy services employees as far as being affected by the transition. (Raley Dep. at 35-36 (133:5-134:17)).

In total, fifteen PSSs were terminated at this stage of the RIF. (Doc. 96-7 at 5). Davis's

cumulative score was near the bottom of the PSSs in the Birmingham location during the October 2014 portion of the RIF, ranking 29th out of 37. (Richardson Dep. at 37 (140:12-141:14); Richardson Decl. at ¶ 30; Doc. 96-7 at 5). Davis had a YTD Raw Score of 2.90 and a YOS Score of 1.60. (Doc. 96-7 at 5). Davis's Impact Factor was rated at 0. (*Id.*). Davis's YTD Raw Score was good for 15th out of the 37 PSSs. (Richardson Dep. at 38-39 (142:3-146:8); Richardson Decl. at ¶¶ 31-32; doc. 96-6 at 102; doc. 96-7 at 2-3). Davis's YOS Score was 24th out of 37. (Richardson Dep. at 39 (146:17-149:41); Richardson Decl. at ¶¶ 33, 39; doc. 96-7 at 5). The only PSS ranked lower than Davis who was not terminated, Tekisha Kennedy (black), applied for and was selected for another position. (Richardson Decl. at ¶ 40).

Although Davis's annual evaluation scores from prior years had resulted in overall scores of "Met," "Exceeded," and "Exceeded," those scores were not considered in the Impact Factor. (Richardson Decl. at ¶ 41). Indeed, PSS Mary Fowler (white) had received higher overall annual evaluations than Davis and had also received a 0 Impact Factor score. (Richardson Decl. at ¶ 41; doc. 96-7 at 5, 14-23). Like Davis, Fowler was also selected for layoff.[17] (Doc. 96-7 at 5).

Some PSSs who were retained had disciplinary history, but none of it had occurred in the twelve months prior to the RIF. Specifically, Margaret Burchfield (white) had been placed on probation for productivity in 1999 and had received counseling and several written warnings, with the most recent one dated May 21, 2004, (doc. 96-7 at 25-31); Susan Anderton (white) had received counseling for various issues and had been written up for productivity, harassment, and attendance, most recently in 2006, (*id.* at 45-54); and Sherry Abrams (white) had received discipline for

---

[17] Fowler also had more years of service than Davis. (Doc. 96-7 at 5).

attendance and productivity prior to 2003, (*id.* at 35-44).   (Richardson Decl. at ¶¶ 45-46).

Additionally, Joan Greer (white) had made a lateral move from PSS II to PSS I in 2008.

(Richardson Decl. at ¶ 43-44; doc. 96-7 at 33).

PSSs who were laid off pursuant to the RIF were not offered the opportunity to transfer to

the McAllen or Tucson locations.   (Richardson Dep. at 43 (163:19-165:9)).   Davis asked

Richardson if she could transfer to one of the new positions, but her request was denied.   (Davis

Dep. at 28 (103:23-104:8); Richardson Dep. at 43 (163:19-165:9)).   Davis did not apply for any

available open positions with Infinity.   (Richardson Decl. at ¶ 46).

### F. Post-RIF

At least twenty-two PSSs remained in the Birmingham office after the RIF.   (Richardson

Dep. at 47 (179:16-180:21), 51-53 (197:8-201:6, 202:2-16, 203:15-205:1)).   None of these retained

PSSs spoke Spanish.   (Richardson Decl. at ¶ 37).   Other PSSs continued to be supervised from

Birmingham, rather than from the areas in which they worked.

Infinity conducted an additional layoff in 2016 as a continuation of the transition.

(Richardson Dep. at 52 (199:16-200:6)).   As a result, there are no longer any PSSs working in

Birmingham.   (Richardson Dep. at 52 (200:7-17)).   However, some of the employees who were

originally PSSs were allowed to apply for (and were retained in) new positions that involved some

of the same duties, albeit with a different job title.   (Richardson Dep. at 53 (202:13-205:19)).

### IV. Analysis

The operative complaint in this action is Davis's third amended complaint, (doc. 51).   One

count of that complaint was dismissed at the motion to dismiss stage. (*See* doc. 56) (dismissing

Count II of Davis's complaint).   Davis has voluntary abandoned three other counts: her retaliation

count (Count IV), asserted against Infinity, and her ERISA counts (Counts V and VII), asserted against Infinity and Adams.  (*See* doc. 106 at 45).   Those counts are **DISMISSED**.  What remains are the following counts, all of which relate to Davis's termination: Count I, a Title VII disparate impact claim based on national origin, asserted against Infinity, (doc. 51 at ¶¶ 49-53); and Count III, a Title VII and 42 U.S.C. § 1981 disparate treatment claim based on race, asserted against Infinity, (*id.* at ¶¶ 60-63).   Neither remaining claim is asserted against Adams, so to the extent this memorandum opinion refers to "Defendants," it refers only to the two Infinity defendants.

### A. Disparate Impact Claim

To establish a prima facie case of disparate impact discrimination under Title VII, a plaintiff must: (1) "identify the specific employment practice that allegedly has a disproportionate impact"; and (2) "establish causation by offering statistical evidence sufficient to show that the practice in question has resulted in prohibited discrimination." *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1314 (11th Cir. 1994); *Pouyeh v. Bascom Palmer Eye Inst.*, 613 F. App'x 802, 810 (11th Cir. 2015).[18]   As to the first element, a plaintiff is "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities."  *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989) (quoting *Watson v.*

---

[18] Some courts separate this two-step process into three steps by pulling out causation as a distinct element from statistical evidence.  *See, e.g., Lee v. Fla., Dep't of Children & Family Servs.*, 135 F. App'x 202, 204 (11th Cir. 2005) ("To establish a prima facie case of disparate impact discrimination, a plaintiff must demonstrate 1) a specific, facially-neutral employment practice, 2) a significant statistical disparity in the racial composition of employees benefitting from the practice and those *qualified* to benefit from the practice; and 3) a causal nexus between the practice identified and the statistical disparity").  There is no functional difference between the two tests.

*Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)).  Once a plaintiff establishes a *prima facie* case, "[t]he burden of production then shifts to the defendant to establish that the challenged employment practice serves a legitimate, non-discriminatory business objective."  *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1275 (11th Cir. 2000) (citation omitted).  A plaintiff may then defeat a showing of a legitimate business practice by establishing that "an alternative, non-discriminatory practice would have served the defendant's stated objective equally as well."  *Id.*

### 1. Specific Employment Practice

The first point of contention between the parties is what exactly the specific employment practice at issue is in this case.  In its motion for summary judgment, Infinity contends the only practice identified in the complaint is "a practice to fire and hire PSSs based on English/Spanish bilingual ability," which it says has been proven false.  (Doc. 95 at 27).  Conversely, Davis says that relevant employment practice is what she terms Infinity's "bilingual transition plan," which includes both the terminations in Birmingham and the hires in Tucson and McAllen, and which Davis argues incorporates a preference for Spanish-speaking employees.  (Doc. 106 at 21-26, 36).

Since "a party may not raise a new theory for the first time in response to a summary judgment motion," *Cruz v. Advance Stores Co.*, 842 F. Supp. 2d 1356, 1360 (S.D. Fla. 2012) (citation omitted), the starting point is what Davis has alleged in her complaint.  *See Cacciamani v. Target Corp.*, 622 F. App'x 800, 804 (11th Cir. 2015) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)) ("It is the complaint that must give the defendant notice of what the plaintiff complains.").  In her third amended complaint, Davis states the following in support of her disparate impact claim regarding Infinity's employment practices:

- "In June 2014, Infinity announced that it was implementing a termination and hiring

27

plan based on a new policy that conditioned hiring and continued employment on being fluent in Spanish.  Based on such policy, Infinity began to terminate employees not fluent in Spanish and replace them with new hires who were fluent in Spanish."  (Doc. 51 at ¶ 12).

- "In September 2014, Infinity delivered a letter to Stephanie Davis stating that she and other employees who were not fluent in Spanish were being terminated.  Two days later, Infinity's Vice President, Jim Raley (Caucasian, non-Hispanic), and Director of Benefits and Compensation, Ronald Ostenfield (Caucasian, non-Hispanic), met with Stephanie Davis and told her that she was being terminated because she was not fluent in Spanish." (*Id.* at ¶ 13).

- "Infinity's policy of conditioning continued employment and employment opportunities on fluency in Spanish has disparate impact on persons like Stephanie Davis who do not have a Spanish-speaking or Hispanic national origin." (*Id.* at ¶ 29)

- "In the alternative, Infinity used its bilingual policy as a pretext for disparate treatment of persons of non-Hispanic national origin, such as Stephanie Davis. Infinity's policy of favoring persons fluent in Spanish is a proxy or pretext for disparate treatment based on national origin for jobs that incumbents like Stephanie Davis [sic].  Infinity took the jobs held by non-Hispanic employees and gave them to Hispanic employees and new hires in a manner which adversely affected Stephanie Davis because of her non-Hispanic national origin." (*Id.* at ¶ 30).

- "Infinity violated Title VII . . . by adopting and using the bilingual policy set forth above . . . [and] discriminated against Stephanie Davis on the basis of national origin when it terminated her pursuant to such policy which had disparate impact on non-Hispanic persons."  (*Id.* at ¶¶ 50-51)

First, even construing the evidence favorably to Davis, the alleged employment practice in

Davis's complaint— "a termination and hiring plan based on a new policy that conditioned hiring

and continued employment on being fluent in Spanish," which resulted in her termination—is

unsupported in the record.  Davis collapses the overarching goal of the reorganization—to increase

bilingual staff—into a requirement that PSSs be bilingual.  However, it is undisputed that the direct

cause of Davis's termination was the 2014 RIF, which did not incorporate a Spanish-language

fluency requirement.  Twenty PSSs were retained at the Birmingham location, none of whom

spoke Spanish.[19]  This directly refutes that Infinity "conditioned . . . continued employment" on

bilingualism.  And, although she alleged in the complaint that she was terminated for lack of

Spanish fluency, Davis's testimony regarding the meeting with Raley and Ostenfield was that she

was not verbally told that she was being terminated for her lack of Spanish fluency and could not

otherwise recall what was said.  (Davis Dep. at 36-37 (135:15-138:18)).  Furthermore, while Davis

points to Raley's testimony that bilingual PSS applicants were preferred—and the court accepts

that fact as true for summary judgment purposes—this is a far cry from a policy that "conditioned

hiring . . . on being fluent in Spanish."  The existence of this policy is also belied by the fact that

at least eight non-bilingual PSSs were hired during the transition.  Put simply, there is no

evidentiary support for the disparate impact theory alleged in the complaint.[20]

---

[19] Davis contends the retention of non-bilingual PSSs is not relevant to her disparate impact claim, arguing that such a claim "does not require that *every* PSS employee be terminated as part of the challenged policy."  (Doc. 106 at 32) (emphasis in original).  However, the fact that non-bilingual PSSs were retained is relevant as to whether the policy, as identified by Davis, existed in the first place.

[20] Davis states she has "not asserted any claim that is not part of the bilingual transition plan challenged throughout the Third Amended Complaint."  (Doc. 106 at 37).  Notably, while there has been some confusion about the precise nature of Davis's claims through several rounds of briefing on motions to dismiss and three memorandum opinions on those motions to dismiss, there has never been any confusion about the underlying policy Davis alleged resulted in disparate impact.  (Doc. 40 at 4 ("This case arises out of Infinity's implementation of a Spanish/English-bilingualism requirement applicable to employees and potential hires."), 13 ("[Davis] has clearly and specifically alleged the existence of a facially neutral employment practice")); (doc. 50 at 3 ("This case arises out of the Infinity Defendants' implementation of a Spanish/English-bilingualism requirement applicable to employees and potential hires (referred to as the "bilingual requirement")); (doc. 56 at 3 ("In September 2014, Infinity announced a termination and hiring plan that required current employees and new hires to be fluent in Spanish (the "bilingual policy")).  Davis cannot plausibly argue the court should now construe her complaint to assert a different theory than the one she has argued all along, and which the court has taken at face value up until this point.  Nor has she moved for leave to amend her complaint to assert the new theory.

Second, even if the court accepted Davis's new argument that the entire transition from Birmingham to other locations is the specific employment practice she identifies, that theory is too broad to support her disparate impact claim.   Title VII permits a challenge to an entire decisionmaking scheme as a single employment practice only where the plaintiff "can demonstrate to the court" that its components "are not capable of separation for analysis . . . ."  42 U.S.C. § 2000e-2(k)(1)(B)(i).  Davis cannot make that showing.  Some polices clearly applied to CSCs only; others clearly applied to PSSs only.  Davis's theory sweeps all of those policies together. Her logic goes like this: Infinity decided to move some jobs away from Birmingham and into new locations in McAllen and Tucson, aiming to achieve 100% bilingual CSC capacity and expecting to benefit from additional bilingual PSSs (although bilingualism was not required of PSSs) at the new locations.  Because of this, she says, decisions concerning CSCs should be a part of the court's analysis.   To fold these in, Davis mostly relies on the memorandum indicating Infinity was "transitioning some positions from the call center and policy services in Birmingham to McAllen, Tucson and/or Miami to increase the number of employees with bilingual Spanish/English skills to better service our customers."   She then connects this to Raley's testimony that the policy of transitioning employees applied to both call center and policy services positions and that the memorandum made no distinction between the two.  (Doc. 106 at 11-12) (citing Raley Dep. at 35-36 (133:5-134:17)).   But Davis cannot make Raley's testimony out to be more than it is—a statement that the reorganization as a whole involved both PSSs and CSCs—when it is undisputed that the CSC bilingualism <u>requirement</u> did not apply to PSSs (even though there was a bilingualism preference for PSSs), the CSCs in Birmingham were RIF-ed according to different criteria than the PSSs in Birmingham and hired according to different criteria in Tucson and McAllen, and the

decisions concerning CSCs were made by different decisionmakers than those that made decisions regarding PSSs.  Under these circumstances, a reasonable jury could not find that Infinity's policies concerning CSCs, including a bilingualism requirement, were part of an inseparable specific employment practice that applied to Davis.[21]

Instead, the only arguably specific employment practice that could apply to Davis would be to pair the RIF of PSSs in Birmingham with the hiring of PSSs in Tucson and McAllen—a discrete event separable from anything concerning CSCs.  But this is considerably narrower than Davis's framing of a "bilingual transition plan" in the abstract.  Because most of Davis's evidence and argument is geared towards showing that the overall reorganization created a disparate impact,

--------------------

[21] Davis states "[t]he Court has already determined on at least two occasions that 'Davis has plausibly alleged the employment practice she challenges in her disparate impact claim is the decision, supported (at this point) by Infinity's letter to her, to "transition[] some positions from the call center and policy services in Birmingham to [other locations] to increase the number of employees with bilingual Spanish/English skills."'"  (Doc. 106 at 21-22) (quoting doc. 85 at 5).  This comes from two sources: an order granting in part Davis's motion to compel and a memorandum opinion denying in part Defendants' motion to dismiss.  Neither helps Davis here.

The language from the undersigned's previous order on Davis's motion to compel indicated that "the letter substantiates that the specific neutral employment practice — the bilingualism policy alleged in the complaint, notwithstanding Defendants' repeated contentions it does not exist — applied to both call center employees and policy services employees."  (Doc. 106 at 21-22) (quoting doc. 85 at 5).  Davis omits the previous portion of this paragraph, which centers the parties' dispute on their intent to "adjudicate the merits of Davis's claims via discovery motions," including the existence of any bilingualism policy, and states "the undersigned declines to probe the merits" of the claims at issue in the context of a discovery motion.  (Doc. 85 at 5).  Instead, the undersigned noted that "for the purposes of discovery," the assumption that the alleged policy exists controlled.  (*Id.*).  And, of course, the undersigned was required to accept as true that the policy existed as described in Davis's complaint in ruling on a motion to dismiss—a standard that does not apply here.  Furthermore, the footnote Davis cites relied on the reasonable inference that the reference to "relevant skill sets" in the letter "includes Spanish language facility and was thus a factor in Davis's termination."  (Doc. 56 at 6 n.6).  As discussed above, the evidence refutes that Spanish-speaking ability was a factor in the RIF.  Davis cannot simply rely on the inference that saved her complaint from dismissal to oppose summary judgment.

Davis fails to plausibly support this.  Regarding whether a RIF can be a specific employment policy, the D.C. Circuit recently noted:

> Courts that have applied Title VII in the context of RIFs have shown how to analyze the layoffs involved as a "particular employment practice." They go beyond the general concept of a "RIF" to identify actionable practices of "selecting only certain (predominantly female) departments," *Shollenbarger v. Planes Moving & Storage*, 297 Fed. App'x 483, 486 (6th Cir. 2008), or of focusing cuts on offices where "black employees are concentrated," *Council 31, Am. Fed'n of State, Cty. & Mun. Emps. v. Ward*, 978 F.2d 373, 375, 377-78 (7th Cir. 1992); *see also Sengupta v. Morrison-Knudsen Co.*, 804 F.2d 1072, 1073-74, 1076-77 (9th Cir. 1986) (analyzing a reduction in force for disparate impact). When an employer cuts back on its workforce by "targeting" demographically disproportionate departments for layoffs, that practice means that "the likelihood of selecting a[n individual in a protected class] increase[s]." *Shollenbarger*, 297 Fed. App'x at 486. Such a practice is what plaintiffs here identify, and is the kind of practice the disparate impact theory of discrimination exists to scrutinize. It is consistent with precedent, and neither unwieldy nor unfair, to treat the processes by which the Agency identified plaintiffs' jobs for elimination as "particular employment practice[s]" under section 2000e-2(k)(1)(A)(i).

*Davis v. D.C.*, 925 F.3d 1240, 1250–51 (D.C. Cir. 2019).  Notably, Davis does not challenge the method Infinity used to select the Birmingham office for a RIF.  Put another way, Davis does not allege Infinity's reorganization pinpointed an office disproportionately composed of non-Hispanics for a RIF (for good reason, as discussed further below).

### 2. Statistical Evidence

Even if Davis had identified an actionable specific employment practice, her disparate impact claim would fail because her statistical evidence is insufficient to show a causal link between that practice and the disparate impact she alleges.

As a preliminary matter, Davis argues that her expert and Infinity's expert "used the same statistical test to determine if an outcome is significant," so what is left is a disagreement based "only on certain defined variables or assumptions in structuring the analysis." (Doc. 106 at 28-

29).  Davis contends this experts' duel cannot be resolved by the court at summary judgment.  (*Id.* at 29).  Davis points the court to *Tyson Foods, Inc. v. Bouaphakeo*, in which the Supreme Court observed that "[o]nce a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury."  136 S. Ct. 1036, 1049 (2016).  However, the court is not required to simply grant that Davis's statistical evidence, once produced, automatically suffices for her *prima facie* case.  Instead, Davis has the burden of producing statistical evidence, and persuading the court that it says what she claims.  *See Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994–95 (1988) ("[T]he plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.").  When statistical evidence is fundamentally flawed based on, e.g., the selection of the incorrect pool of employees or applicants, it is not probative of disparate impact.  *See Wards Cove*, 490 U.S. at 651 (1989).

To support her allegations of disparate impact, Davis has offered the report of Dr. Liesl M. Fox ("Dr. Fox"), (doc. 103-93 ("Fox Report"), and a supplement to that report, (doc. 103-94 ("Fox Report II").  As modified by her supplement, Dr. Fox reached the following conclusions regarding national origin disparate impact,[22] based on her analysis of the data:

- "A statistically significantly disproportionate number of non-Hispanic employees were targeted for RIF termination from the PSS position at Infinity," (Fox Report II at 3);

- "The apparent requirement that employees working in the Policy Services Specialist

---

[22] Dr. Fox also reached a conclusion that the criteria used to rank PSSs in Birmingham for the RIF "had an adverse impact on the African-American PSS employees in Alabama."  (Fox Report II at 2).  However, there is no race-based disparate impact claim in this action, and Davis does not rely on Dr. Fox's report in support of her race-based disparate treatment claim.  (*See generally* doc. 106 at 37-44).

position be fluent in Spanish resulted in the disproportionate number of Hispanics hired into PSS positions at Infinity," (*id.*);

- "A statistically significantly disproportionate number of Hispanic employees were hired into PSS positions at Infinity," (*id.*);

- "The requirement that employees working in Customer Service Positions be fluent in Spanish resulted in the disproportionate number of Hispanics hired into the Customer Service Positions at Infinity," (*id.*).

There are significant problems with the way Dr. Fox arrived at the first, second, and fourth of these conclusions, some of which have been discussed above and none of which require the court to weigh the persuasiveness of the experts' opinions against each other. As to the first conclusion, Dr. Fox "identified 73 individuals who were employed in PSS positions at Infinity in Alabama, Texas, and Arizona," of which "62 were employed prior to October 31, 2014"—the date of the final step of the RIF in the Birmingham office. (Fox Report at 3). Dr. Fox declined to separately analyze each location on the basis that "all employees, regardless of location, working in the PSS position were eligible for RIF termination if the goal of Infinity was merely to reduce their workforce." (Fox Report II at 5). There are two intertwined problems with this. First, Infinity has never maintained that its goal was to reduce its workforce; instead, its stated goal was to consolidate its business operations and physical locations in states other than Alabama, with the intention of reducing overhead and saving money. This leads into the second issue, which is that only PSSs in Alabama were eligible for the RIF because of that stated goal. In fact, Dr. Fox includes in her calculations numerous PSSs who were hired well after the decision to select the Birmingham office for a RIF was made (i.e., prior to June 2, 2014). Dr. Fox takes as the relevant population group the entire group of PSSs employed in McAllen, Birmingham, and Tucson prior to October 31, 2014. (*See* doc. 103-93 at 3; doc. 103-94 at 4). As Infinity notes, no PSSs were

hired in either McAllen or Tucson prior to at least Phase I of the Birmingham RIF.  (Doc. 95 at 19) (citing Richardson Decl. at ¶¶ 24-27, 48).  Specifically, no PSSs were hired in McAllen until August 2014, and no PSSs were hired in Tucson until September 8, 2014.  (Richardson Decl. at ¶ 48).  Of course, it would have been temporally impossible to have selected PSSs hired after the institution of the RIF for termination, notwithstanding that the actual mechanism of the RIF occurred after some PSSs were hired in McAllen and Tucson.  Nor, for that matter, is it plausible Infinity would hire employees only to immediately select them for a RIF.  To the extent Dr. Fox draws the conclusion from her analysis that non-Hispanic PSSs were overrepresented in termination, (Fox Report at 4), it is not a meaningful one for disparate impact purposes and is not probative of Davis's *prima facie* case.

Dr. Fox's second conclusion also starts from a faulty premise: the "apparent requirement" that newly-hired PSSs were to speak Spanish.  As discussed above, there is no evidence to support a bilingualism requirement for PSSs.[23]  Davis appears to contend Infinity's "practice of 'preferring' PSS employees that were bilingual" suffices, (doc. 106 at 29-30), but this does not square with Dr. Fox's assumption of a *requirement* that led to "Infinity's policy of primarily recruiting individuals who are Spanish-speakers to fill the PSS positions . . . ."  (Fox Report at 8).  Dr. Fox compounds this error at various points in her report, incorrectly stating that "Infinity informed the PSS employees in Alabama during the RIF process in 2014 that the ability to speak

---

[23] Dr. Fox's report draws from the Third Amended Complaint, so it is no surprise that she took Davis's theory of the case as challenging Infinity's supposed "termination and hiring plan based on a new policy that conditioned hiring and continued employment on being fluent in Spanish," rather than the theory Davis alleges now.

Spanish was going to be a factor used in the RIF decision." (Fox Report at 6, n.8). Dr. Fox's reliance on a nonexistent "apparent requirement," refuted by the evidence, renders this conclusion useless to demonstrate statistical disparity.

Finally, Dr. Fox's supplemental report contains an extended analysis of "Customer Services Positions" that combines the CSC position with the PSS position. (Fox Report II at 7-14). In doing so, Dr. Fox conflates the "selection process" of positions with manifestly different selection processes, differing criteria for layoff during the Birmingham RIF and hiring in other locations, and which were in different departments under different management. Dr. Fox relies on "the assumption that Infinity is using the ability to speak Spanish as a factor in the hiring process" of *all* Customer Service Positions, (*id.* at 10), notwithstanding that the undisputed evidence is that the CSC position truly had a bilingualism requirement, while the PSS position had a bilingualism preference as between candidates. In other words, while Infinity may have used Spanish-speaking ability as "a factor" in the hiring process of both CSCs and PSSs, it did so in markedly different ways. Yet Dr. Fox drew no distinction between the two and simply analyzed them as though they were the same. Davis cannot build a statistical case on such a foundation, and Dr. Fox's conclusion combining the two positions is not competent evidence to support a disparate impact claim.

What is left is Dr. Fox's conclusion that "[a] statistically significantly disproportionate number of Hispanic employees were hired into PSS positions at Infinity," (Fox Report II at 3). But, absent Dr. Fox's other conclusions, nothing about this conclusion supports causality in this case because it is unconnected to the RIF that impacted Davis. Instead, it is simply a "'bottom line' statistical imbalance in [Infinity's] workforce," which is insufficient to state a *prima facie* case. *Joe's Stone Crab*, 220 F.3d at 1276.

### 3. Legitimate Business Justification

Finally, even assuming Davis had identified a specific employment practice and that her statistical evidence supported causation, "not all employment practices causing a disparate impact impose liability" under Title VII. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 531 (2015). Specifically, an employer may defeat a disparate impact claim by "establish[ing] that the challenged employment practice serves a legitimate, non-discriminatory business objective." *Joe's Stone Crab*, 220 F.3d at 1275 (citation omitted).[24] "When considering the employer's justification, 'the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer.'" *MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 771 (11th Cir. 1991) (citing *Ward's Cove*, 490 U.S. at 659). Once the employer offers such a justification, the onus is on the plaintiff to demonstrate "an alternative, non-discriminatory practice would have served the defendant's stated objective equally as well." *Id.* "[J]ust suggesting an alternative practice is insufficient to meet the plaintiff's burden: the alternative practice 'must be equally effective as [the employer's chosen practice] in achieving [its] legitimate employment goals.'" *MacPherson* 922 F.2d at 771.

---

[24] Davis contends "defendant's burden of affirmatively proving business necessity requires convincing affirmative proof that 'there exist[s] an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business', that 'the business purpose [is] sufficiently compelling to override any racial impact', that 'the challenged practice . . . effectively carr[ies] out the business purpose it is alleged to serve', and that there is 'no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with lesser differential racial impact.'" (Doc. 106 at 34 (citing *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 245 (5th Cir. 1974); *Craig v. Alabama State University*, 804 F.2d 682, 686 (11th Cir. 1986)). Neither cited case states the prevailing standard for showing business necessity.

At the outset, Infinity has provided a business justification for its transition of PSSs to McAllen and Tucson: its desire to cut costs by transitioning workers to states with a lower rate of pay, coupled with efficiencies in having PSSs working in the same locations as CSCs.  To support this, it offers Richardson's and Raley's testimony, which supports that Infinity determined that wages and overhead would be lower in McAllen and Tucson and that having on-site PSSs would result in better ability to interact with CSCs and with management, and fewer issues with time zones and local weather.  (*See* Richardson Dep. at 50:22-52:15, 179:16-180, 197:14-198:9; Richardson Decl. at ¶¶ 20, 21, 23; Raley Decl. at ¶ 10).  "Minimizing the cost of labor is a legitimate business consideration."  *Abbott v. Fed. Forge, Inc.*, 912 F.2d 867, 875 (6th Cir. 1990). The reduced cost of labor is supported by Raley's testimony that, prior to selecting the Tucson and McAllen locations, Infinity researched locations where they could pay salaries less than those in Birmingham.[25]  (Raley Dep. at 19 (66:5-67:3).  The Supreme Court has also characterized "the general objective[] . . . [of] efficiency" as a legitimate business concern in the disparate impact context.  *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 592 (1979).  Here, the evidence sufficiently supports that part of Infinity's legitimate goal was to take advantage of the efficiencies to which Richardson testified.

Davis starts her dispute with the legitimacy of Infinity's justification by sidestepping it.

---

[25] Davis cites *Chrapliwy v. Uniroyal, Inc.*, 458 F. Supp. 252, 271 (N.D. Ind. 1977), in support of the proposition that "dollar cost alone is an immaterial consideration under the business necessity doctrine."  *Chrapliwy* in turn relies on the test articulated in *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir. 1971).  *Id.* at 269.  The *Robinson* test, which is substantially the same one set out in footnote 24 above, is not the prevailing test for determining business necessity. *Chrapliwy* is not binding, and the undersigned does not find its reasoning persuasive in light of authority to the contrary.

Instead, she focuses on a contention that "Infinity has made no effort to establish a business necessity for 'preferring' bilingual PSS employees." (Doc. 106 at 33). Davis tries to have it both ways here, alleging that the transition is the policy at issue for the purposes of the specific employment practice part of the analysis, but then pointing to the bilingualism preference as the policy for which Infinity is required to provide a business justification. Since the only plausible way Davis could get to this point in the analysis is if the court assumed she satisfied the first part of her *prima facie* case—i.e., by pointing to the move of PSS jobs from Birmingham to Tucson and McAllen—Davis's arguments about whether Infinity has shown a business necessity for a bilingualism preference are beside the point.[26]

Davis does get to the issue at hand by disputing that Infinity's cost-savings and convenience arguments are legitimate. (Doc. 106 at 34-35). She argues these were never part of the plan's announcement or contemporary documentation when the policy was adopted. (*Id.*). For this, Davis points to Infinity's EEOC position statement, (doc. 103-95), Edgecomb's June 3, 2014 conversation outline, (doc. 103-18), and Infinity's September 17, 2014 memorandum, (doc. 103-19). First, the EEOC statement is not evidence. *See Moore v. Hale*, 2010 WL 11507178, *12 n.13 (N.D. Ala. 2010) (citing *See Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp.2d 1228, 1236 (M.D.

---

[26] Leaving aside that the bilingualism preference is not at issue here, Raley's affidavit supports that bilingualism was a value-add, on an individual employee basis. As Infinity notes, (dco. 111 at 133), while PSSs did not frequently encounter Spanish-language communications, they did so between one and three percent of the time. It is not illegitimate that Infinity might have preferred employees who could handle these communications without shuttling them to other employees. *See Dalmau v. Vicao Aerea Rio-Grandense, S.A.*, 337 F. Supp. 2d 1299, 1312 (S.D. Fla. 2004) (collecting cases for the proposition that bilingualism is a legitimate, nondiscriminatory business purpose when used to accommodate non-English-speaking customers).

Ala. 2000)) ("EEOC position statement is not evidence" and "cannot be used to create an issue of fact."). Second, Davis offers no reason why either of the other documents, which explained the general nature of the RIF to employees, would be expected to incorporate Infinity's entire rationale for the relocation of jobs from Alabama to other locations. Furthermore, these documents do not actually contradict Raley's or Richardson's testimony regarding cost savings and convenience; at no point does either say that the sole goal of the reorganization was to increase bilingual employees. These are not the type of shifting rationales that might create credibility issues as to Infinity's true goals. The undersigned finds Infinity's justifications to be plausible in light of the evidence.

Since Infinity has provided a legitimate business justification, the burden shifts back to Davis to show an alternative that would have accomplished the same thing. She does not do so. First, Davis states that she requested transfer and would have relocated, if not for Infinity's rule barring her from doing so. (Doc. 106 at 35). Davis does not explain why Infinity would have been expected to allow employees to transfer to a new location after they were terminated based on a metric that (rightly or wrongly) weighed value to the company, nor does she explain how allowing her to transfer would have accomplished Infinity's goal of lowering its wage rates. Similarly, Davis's contention that Infinity could have had PSSs work from home (as it did with some employees), (doc. 106 at 35-36), does not address either wage rates or the efficiencies Infinity said it would achieve from having the PSSs support CSCs within the same location. In fact, Richardson indicates "allow[ing] some PSSs to work from home in Alabama . . . was not a viable solution" because it "would not have provided the PSS on-site support in McAllen and Tucson . . . would not have eliminated the issue arising from having employees and customers in different time

zones . . . [and] Infinity would not have obtained the cost savings from lower wages and benefits in McAllen and Tucson by making the current Alabama PSSs homeworkers." (Richardson Decl. at ¶ 25). Davis says Infinity has offered no evidence of cost savings because the McAllen branch was ultimately less productive, (doc. 106 at 36), but this quarrels with the eventual results of the move and not its initial justification.

Since Davis has not isolated a specific employment practice, lacks relevant statistical evidence of disparate impact even giving her the benefit of the doubt that she has isolated one, and cannot overcome Infinity's legitimate business justification, Infinity is entitled to summary judgment on Davis's disparate impact claim.

### B. Disparate Treatment Claim

A Title VII plaintiff asserting a disparate treatment claim must show the defendant acted with discriminatory intent. *Denny v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001). "In order to show discriminatory intent, a plaintiff must demonstrate that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects on an identifiable group." *Joe's Stone Crab, Inc.*, 220 F.3d at 1273 (internal quotation marks, alterations, and citation omitted). "[T]he analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same."[27] *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citations omitted).

When a plaintiff bases her disparate treatment claims on circumstantial evidence, the court

---

[27] Section 1981 claims are actionable via 42 U.S.C. § 1983. *See Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 735 (1989).

generally applies the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973).  Under the *McDonall Douglas* framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (citation omitted). If the plaintiff makes this showing by a preponderance of the evidence, the burden shifts to the defendant employer to show a legitimate, nondiscriminatory reason for its actions. *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant makes this showing, the burden shifts back to the plaintiff to "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Lewis*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 256).

"The inquiry into pretext requires the court to determine, in view of all the evidence, 'whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct.'" *Crawford*, 529 F.3d at 976. A pretextual reason is not only one that is false but one that conceals an actual, discriminatory reason. *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

**1. *Prima Facie* Case**

There is no question that Davis is part of a protected class or that she was subjected to an adverse employment action.  Further, Infinity does not argue (for *prima facie* case purposes) that similarly-situated white comparator employees were not retained.[28]  However, the parties dispute whether Davis was qualified for her job.  Infinity says Davis was not qualified under the RIF criteria.  (Doc. 95 at 39).  Davis says she was qualified for her job as a general matter.  (Doc. 205 at 37).  Davis has the better argument here.  "Where a plaintiff has held a position for a significant period of time, qualification for that position, sufficient to satisfy the test of a prima facie case can be inferred."  *Pace v. Southern Ry. System*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983).  Whether Davis was appropriately subjected to the RIF is a question better addressed at the second and third stages of the *McDonall Douglas* framework.  Davis has sufficiently made out a *prima facie* case to shift the burden to Infinity.

**2. Nondiscriminatory Basis for Termination**

As its nondiscriminatory reason for terminating Davis, Infinity points to the neutral selection criteria in its RIF, applied to all PSSs.  (Doc. 95 at 40).  Davis disputes that this is a nondiscriminatory reason, (doc. 106 at 40-41), but her arguments in support of this proposition do not back that up.  Instead, Davis seeks to show her supervisor, John Finney, could not recall *why*

---

[28] In her response, Davis points in footnotes to white co-workers Anderton, Abrams, Greer, and Burchfield.  (*Id.* at 40 n.4, 43 n.7).  Davis includes very little about these comparators except that they received higher Impact Factor scores, despite having lower performance reviews.  Still, there is little reason to question that these comparators were "similarly situated in all material respects," *Lewis*, 918 F.3d at 1218, especially when Infinity does not challenge them as part of Davis's *prima facie* case: they were subjected to the same RIF and evaluated on the same criteria by the same decisionmakers.

Davis received a low Impact Factor score, and thus that the score is suspect.  (*Id*).

Davis's argument does not demonstrate that the RIF's selection criteria were facially nondiscriminatory or illegitimate.  Infinity's burden at this stage of the inquiry is merely to show "the reasons for plaintiff's rejection," which, if nondiscriminatory, narrow the inquiry to the validity of those reasons.  *Burdine*, 450 U.S. at 254 (1981).  The employer's burden "is satisfied if he simply explains what he has done or produc[es] evidence of legitimate nondiscriminatory reasons."  *Holifield v. Reno*, 115 F.3d, 1555, 1564 (11th Cir. 1997).  "[T]he employer's reason need only be specific enough so that the plaintiff is afforded a full and fair opportunity to demonstrate pretext."  *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1205 (11th Cir. 2013) (internal quotation marks, alterations, and citation omitted).  Infinity has carried its burden.  This is perhaps best shown by Davis's briefing itself, which focuses on her contention the criteria used for the RIF were inappropriate.  Davis is well aware of Infinity's specific, stated reason for terminating her; she simply disputes it was nondiscriminatory.  In other words, Davis's arguments go to pretext, not whether Infinity has successfully shifted the burden back to her.  Davis's pretext arguments are addressed below.

### 3. Pretext

Infinity describes the Impact Factor score as "supervisor assessment of each PSS's anticipated fit going forward, including, but not limited to, their ability to deal with change."  (Doc. 95 at 41).  Davis characterizes the explanation of the Impact Factor as "an after-the fact justification which was originally meant to use a single stray comment from the plaintiff's overwhelmingly positive performance review."  (Doc. 106 at 42).  This shifting rationale, she says, points to pretext.  (*Id.*) (citing *Keaton v. Cobb County*, 545 F. Supp. 2d 1275, 1303 (N.D. Ga. 2007)

and *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002)).  She cites Richardson's testimony that Impact Factor "was a number generated for us to assess the ability of people to handle change, assess the ability of people to handle change, the complexities that were in common as we looked to adapt across the organization and grow operations at other sites, and the people that we were going to need at the table to help us do that, change being the largest component." (*Id.* at 41-42) (citing Richardson Dep. at 149:5-13).  Davis contrasts this with a memo describing "employee fit" as an "important factor we must consider," accompanied by a note from Raley stating "amount of time it takes to manage an individual."  (*Id.*) (citing doc. 103-26 at 2).  What Davis does not show, however, is any evidence that any specific component was dispositive in a PSSs Impact Factor score, or that the memo is inconsistent with a subjective manager evaluation that included "ability to handle change."  Davis portrays the memo and accompanying note as inconsistent with an evaluation based on "ability to handle change," but there is no evidence that Raley's note, or the memo itself, contained the sole criteria used in an Impact Factor score, and that is not a reasonable inference in light of evidence to the contrary.  In short, although Davis <u>says</u> there is a conflict between the memo, the handwritten note, and other evidence, she fails to <u>show</u> a genuine dispute that there was an actual conflict.[29]

Although there is ambiguity in what went into the Impact Factor score, Davis's attempt to show it was incorrect by pointing to her performance reviews misses the mark.  It is undisputed

---

[29] To the extent Davis implies Raley wrote his note on the memo after Davis was fired and in anticipation of litigation (which Infinity denies, (*see* doc. 111 at 15-16, n.14)), there is no evidence to support that implication and the court may not speculate to assume its truth.  *See Hammett v. Paulding County*, 875 F.3d 1036, 1049 (11th Cir. 2017) ("[A]n inference based on speculation and conjecture is not reasonable.") (citation omitted).

Davis's performance reviews were not directly considered in the RIF, nor were the performance reviews of any other PSS.  There is some tension between Richardson's testimony that handling change was "the largest component" of the Impact Factor score and Davis's 2014 performance review indicating she "Met" expectations for Dealing with Change, (*see* doc. 103-15 at 2).  At best, this shows that the Impact Factor score was subjective and not directly tied to previous performance evaluations regarding Dealing with Change.  But a subjective evaluation is not evidence of pretext unless a plaintiff rebuts the employer's "clear and reasonably specific factual basis" for the assessment.  *See Chapman v. AI Transp.,* 229 F.3d 1012, 1033-34 (11th Cir. 2000).  Davis has not done so here, because the evidence is undisputed that her 2014 performance review indicated that she specifically needed "to work on dealing with change as the department moves forward" and to do more diverse work.  Rather than being inconsistent with the stated aims of the Impact Factor, Davis's performance review tracks the score she received.  Because she cannot show the Impact Factor was inconsistent with the "clear and reasonably specific factual basis" Infinity has provided, she cannot show her low Impact Factor score (and thus her termination) was pretextual.

Nor, even if the Impact Factor score were pretextual, does Davis marshal any evidence to show that her termination was race-based.  In a footnote, Davis points to several white comparators who also received "Met" Dealing with Change scores yet received 4 or 3 Impact Factor scores (Greer, Anderton, and Burchfield), several black comparators who received "Exceeded" Dealing with Change scores yet scored 0 or 1 on Impact Factor (LaToya Gaines, Betty Nelson, Shamika Bry, and Chaymilla Dykes), and still other black comparators who received 2 and 3 Impact Factor scores but also received "Exceeded" Dealing with Change assessments (LaShaunda Wilson-King,

Kimberly Scott, Christina Whaley, and Michelle Moffett).  (Doc. 106 at 44, n.7).  One obvious problem with this comparison is that despite receiving low Impact Factor scores, Betty Nelson and Shamika Bry were retained under the RIF.  Furthermore, all of the black comparators who received 2 and 3 scores were also retained.  (*See* doc. 96-7 at 5).  And, as Infinity points out, white PSS Mary Fowler, who also received a "Met" Dealing with Change assessment on her 2014 performance review and who also received complimentary remarks (and, unlike Davis, no specific areas for improvement in the Overall Comments section), (doc. 96-7 at 14-15), also received a 0 Impact Factor score and was also RIF-ed, (*id.* at 5).  Finally, the only PSS who scored lower than Davis and retained a job with Infinity, Tekisha Kennedy, was black.  (Richardson Decl. at ¶ 40).  As stated above, Davis has demonstrated that there was no tight relationship between performance ratings and Impact Factor scores, but Infinity never claimed there was, and this shows neither pretext in the abstract nor that the Impact Factor scores were a pretext for racial discrimination specifically.  Accordingly, Infinity is due summary judgment on Davis's disparate treatment claim.

## V. Conclusion

For the reasons stated above, Davis's motion to strike, (doc. 104), is **GRANTED IN PART** and **DENIED IN PART**.  Infinity's motion for summary judgment, (doc. 94), is **GRANTED**.  A separate order will be entered.

DONE this 31st day of March, 2021.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE

47